FILED

2023 Jun-02  PM 03:37
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

D. DEATON, T. PEAKE, J.K.D.,
L.W.D., R.E.D., G.M.W.

*Plaintiff*,

v.

PATRICIA STEPHENS, AGNES
CHAPPELL, ALISHA RUFFIN MAY,
JESSICA KIRK DRENNAN, AMANDA
DUNCAN, CLOTELE BRANTLEY,
EVERETT WESS, PAIGE
YARBROUGH, DEBORAH
GREGORY, LAURA MONTGOMERY
LEE, JUDITH CRITTENDEN, GARY
LEE, THOMAS MCKNIGHT, JR., JAY
CLARK, RENEE WILSON, COMPTON
WILSON, ERIKA GOLDMAN,
MICHAEL LABELLARTE, DALE
MAYNARD, TERRI MILLER, DAVID
KELLNER, DEEGAN MALONE,
ANDREA WEISS, CONNIE COKER,
ALAN BLOTCKY, WENDY CREW,
CHRISTINA VINEYARD, MARCUS
JONES, MADISON BRANTLEY,
CRAIG LANGRALL, CAROLYN
WYATT, GARY WYATT, ROBERT
ERIC MASHBURN, CAROLINE
TAYLOR, KIM DAVIDSON,
HEATHER FANN, KIRK.DRENNAN,
PC, CRITTENDEN PARTNERS, P.C.,
WALLACE, JORDAN, RATLIFF &
BRANDT, L.L.C., ST. ANNE'S
SCHOOL OF ANNAPOLIS,
INCORPORATED, SOUTHERN
MARYLAND DREDGING, INC.,
HOPE FOR HEALING, LLC, SOLACE
FAMILY COUNSELING, LLC, CPE
CLINIC, LLC, BAY AREA
CHRISTIAN COUNSELING, CREW
GENTLE LAW, P.C., CREW LAW

CASE NO.

_____

<u>**COMPLAINT**</u>

**TABLE OF CONTENTS**

**INTRODUCTION**                                              **Page 3**

**JURISDICTION AND VENUE**                          **Page 5**

**THE ENTERPRISE**                                        **Page 6**

**PARTIES**                                                      **Page 8**

**FACTS**                                                        **Page 30**

**EXHAUSTION OF LEGAL REMEDIES**             **Page 124**

**CLAIMS**                                                      **Page 126**

**PRAYER FOR RELIEF**                                  **Page 174**

**JURY DEMAND**                                          **Page 176**

Mr. D. Deaton, Ms. T. Peake, and minor children J.K.D., L.W.D., G.M.W., and R.E.D., through the undersigned counsel, brings this action and alleges in support of its Complaint as follows:

## INTRODUCTION

1.  The Jefferson County Circuit Court Domestic Relations Division has an established and pervasive culture of corruption that has metastasized to certain judges, court appointees, attorneys, and "professionals" acting at their direction to extort, defraud, tortiously injure, and deprive citizens of their constitutional rights for ill-gotten gains.

2.  The defendants have engaged in a pattern of predatory, self-enriching behavior that predates the unfortunate series of events complained of herein and has been protected through conspiratorial self-insulation. Prior to the Plaintiffs' exposure to the scheme, previous litigants in Jefferson County established a family law advocacy organization in January 2018 in response to the exploitation of this enterprise and a local business owner dedicated his

website to attempting to expose the illegal activity directly affecting minor children in Jefferson County.

3.   Judge Patricia Stephens is the Presiding Judge of Jefferson County Circuit Court Domestic Relations Division in Alabama. Judge Patricia Stephens uses the authority of her office to influence and dictate the outcome of cases not assigned to her. Judge Patricia Stephens has been left unchecked, and the citizens within this community are without access to litigate their claims and without relief from the damage caused by this enterprise, described in detail below, engaging in illegal acts. During her tenure, two judges she directly supervised have thus far been removed from the bench of Jefferson County Circuit Court Domestic Relations Division.

4.   Ten years ago, Judge Batiste was ordered suspended for three months without pay from Jefferson County Circuit Court Domestic Relations Division for ethical violations.

5.    Seventeen months ago, Judge Blocton was removed from Jefferson County Circuit Court Domestic Relations Division for bad acts and further disbarred from the practice of law.

6.   Both Judge Batiste and Judge Blocton were directly supervised by Judge Patricia Stephens.

7.   The judges, court appointees, and professionals working at the direction of the court appointees are engaged in a scheme spanning multiple years to

destroy evidence, threaten the Plaintiffs, deprive the Plaintiffs of their constitutional rights and property, manipulate and provide false statements in multiple tribunals and to multiple state regulatory agencies, while always seeking to further litigation and fees.

8.  Few litigants can withstand the physical, emotional, and financial harm caused by the co-conspirators and co-defendants. The Plaintiffs were unknowingly swept up in the ongoing scheme when they independently came before the Court in separate post-divorce custodial cases seeking to protect their children.

9.  The Plaintiffs addressed and have acted upon their belief for pursuing all possible, legal steps to protect their constitutional rights. Any parents daring to question these fraudulent practices are punished with no regard to the effects on the minor children.

10. Ms. T. Peake and Mr. D. Deaton want to protect their children. The Plaintiffs, including all the Plaintiff minor children, file this lawsuit to protect their constitutional rights and legal protections from this fundamentally corrupt system of retaliatory and relentless government and private action that prioritizes cash, power, and influence over justice.

## **JURISDICTION AND VENUE**

11.   The court has jurisdiction as this case involves claims arising from the Constitution and laws from the United States pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343.

12.   Federal courts have subject matter jurisdiction over RICO claims pursuant to 18 U.S.C. § 1964.

13.   The Court has supplemental jurisdiction over Plaintiffs' additional state law claims pursuant to U.S.C. § 1367.

14.   Venue is proper in this division of this Court pursuant to 28 U.S.C. § 1391(b)(2) and (3) as a substantial part of the events or omissions giving rise to the claims stated herein occurred in the southern division of the Northern District of Alabama and all Defendants are subject to this Court's personal jurisdiction with respect to the claims asserted herein.

## THE ENTERPRISE

15.   The Defendants, jointly and severely, and the co-conspirators conducted or actively participated in conduct of an association, ("The Enterprise"), through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c). Additionally, and in the alternative, the defendants, and the co-conspirators, through an agreement to commit two or more predicate acts, conspired to conduct or participate in the conduct of The Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(d). The actions of the

co-defendants were in furtherance of The Enterprise and in violation of 18 U.S.C. § 1962(d).

16. The Enterprise participants include Defendants: Patricia Stephens, Agnes Chappell, Alisha Ruffin May, Jessica Kirk Drennan, Amanda Duncan, Clotele Brantley, Everett Wess, Paige Yarbrough, Deborah Gregory, Laura Montgomery Lee, Judith Crittenden, Gary Lee, Thomas McKnight, Jr., Jay Clark, Renee Wilson, Compton Wilson, Erika Goldman, Michael Labellarte, Dale Maynard, David Kellner, Deegan Malone, Andrea Weiss, Connie Coker, Alan Blotcky, Wendy Crew, Christina Vineyard, Marcus Jones, Madison Brantley, Craig Langrall, Carolyn Wyatt, Gary Wyatt, R. Eric Mashburn, Caroline Taylor, Kim Davidson, Heather Fann and Terri Miller and numerous other medical providers and court appointees enlisted to further the enterprise's purpose.

17. The entities operated by The Enterprise participants are: The Domestic Relations Division of the 10th Judicial Circuit Court for Jefferson County, Kirk.Drennan, P.C., Crittenden Partners P.C., Wallace, Jordan, Ratliff & Brandt, L.L.C., St. Anne's School of Annapolis, Incorporated, Southern Maryland Dredging, Inc., Hope for Healing, LLC, CPE Clinic, LLC, Bay Area Christian Counseling, Crew Gentle Law, P.C., Crew Law Group, Caroline O. Taylor P.C. The Wess Law Firm, P.C., and Hardy Law Firm, LLC.

18.    The purpose of The Enterprise was to knowingly create unconstitutional, inflated or completely fabricated legal fees, make false statements in multiple tribunals, offer and accept bribes, extort, and conceal information from state and federal agencies, so that The Enterprise participants could profit directly or in some other manner while depriving parents and children of their constitutionally protected rights.

19.    As alleged in detail below, the defendants and The Enterprise used influence under the color of state law, and the Defendants and the co-conspirators executed these strategies to increase profits by extorting the Plaintiff parents, while deceiving state regulatory bodies and making false statements in multiple courts across different states.

## PARTIES

20.    Plaintiff Taylor Peake, ("Ms. T. Peake"), brings these actions, individually on her own behalf and as mother and next friend of G.M.W., her minor child. At all times relevant and material to this complaint, both were residents of Jefferson County, Alabama.

21.    Plaintiff Drew Deaton, ("Mr. D. Deaton"), brings these actions, individually on his own behalf and as father and next friend of J.K.D., L.W.D., and R.E.D., his minor children. At the time of this filing, the minor children are

residents of Anne Arundel County, Maryland. During the times relevant to this complaint, the minor children lived with their father in Jefferson County, Alabama or with their mother in Anne Arundel County, Maryland.

22.   Plaintiffs G.M.W., J.K.D., L.W.D., and R.E.D.[1] are all minor children and this action is being brought on their behalf individually. The claims alleged by the minor children accrued while they all were minor children. All of the Plaintiff minor children continue to be minor children as of the filing of this complaint as none have yet reached the age of majority.

23.   Defendant Patricia Stephens, ("Judge Stephens"), was and continues to be the Presiding Judge of the Tenth Circuit of the Jefferson County Domestic Relations Court at all times relevant to this complaint. Judge Stephens is an adult resident of Jefferson County, Alabama. As the presiding judge, she has the duty and obligation to supervise the domestic relations judges in this circuit, including the judges and court staff serving under her. Judge Stephens acted inside and apart from the litigation process, including but not limited to the following ways: (1) to gather evidence not before her court, (2) to hold *ex parte* calls regarding cases before her court and refuse to disclose the caller on the record, and (3) exited her chambers to participate in a dispute in the lobby of the courthouse. The constitutional rights

---

[1] Pursuant to the Fed. R. Civ. P. 5.2, the minor children's initials are used in place of names so as to protect their privacy.

violations and other injuries complained of herein were proximately caused by a pattern and practice of misconduct and criminal activity which occurred with the consent and direction of Judge Stephens who personally knew about, facilitated, approved, and/or condoned this pattern and practice of misconduct including The Enterprise and its actions.  Mr. D. Deaton's case was transferred to her court and remains pending as of the filing of this complaint. Judge Stephens is sued in her individual capacity.

24. Defendant Agnes Chappell, ("Judge Chappell"), is recently retired from the Tenth Circuit of the Jefferson County Domestic Relations Court. Judge Chappell is an adult resident of Jefferson County, Alabama. Ms. T. Peake and Mr. S. Wyatt's divorce and post-divorce custodial cases were assigned to Judge Chappell. At all times relevant, Judge Chappell was supervised by Judge Stephens as her presiding judge. Judge Chappell also had a duty to supervise the staff assigned to her. Judge Chappell acted inside and apart from the litigation process, including but not limited to the following ways: (1) to delegate her judicial duties to a non-attorney, (2) to use public property while on duty during business hours to film campaign video advertisements against Ms. T. Peake's attorney, and (3) to wield the prestige of her office to designate her judicial successor prior to the election. The constitutional rights violations and other injuries complained of herein were proximately caused by a pattern and practice of misconduct and criminal

activity which occurred with the consent and direction of Judge Chappell who personally knew about, facilitated, approved, and/or condoned this pattern and practice of misconduct including The Enterprise and its actions. Judge Chappell is sued in her individual capacity.

25. Defendant Alisha Ruffin May, ("Judge May"), is a judge of the Tenth Circuit of the Jefferson County Domestic Relations Court. Judge May is an adult resident of Jefferson County, Alabama. At all times relevant hereto, Judge May is a judge of the Domestic Relations Division of the Tenth Circuit of Jefferson County Court. Judge May served as the judge over a post custody domestic relations case between Ms. T. Peake and Mr. S. Wyatt. The constitutional rights violations and other injuries complained of herein were proximately caused by a pattern and practice of misconduct and criminal activity which occurred with the consent and direction of Judge May, who personally knew about, facilitated, approved, and/or condoned this pattern and practice of misconduct including The Enterprise and its actions. Judge May is sued in her individual capacity.

26. Defendant Jessica Kirk Drennan, ("Attorney Drennan"), is a licensed attorney through the Alabama State Bar. Attorney Drennan is an adult resident of Jefferson County, Alabama. At all times relevant hereto, Attorney Drennan was employed by and an owner of Defendant Kirk.Drennan, P.C. Attorney Drennan has and is currently representing Ms. L. Deaton. During

the pendency of Ms. L. Deaton's pending lawsuit against a church preschool, Attorney Drennan is serving as the key witness for Ms. L. Deaton while representing her custody case. The constitutional rights violations and other injuries complained of herein were proximately caused by a pattern and practice of misconduct and criminal activity across states which occurred with the consent and direction of Attorney Drennan separate, apart, and unnecessary to the litigation process.

27.   Defendant Amanda Duncan, ("Attorney Duncan"), is a licensed attorney through the Alabama State Bar. Attorney Duncan is an adult resident of Jefferson County, Alabama. At all times relevant hereto, Attorney Duncan was employed by Defendant Kirk.Drennan, P.C. The constitutional rights violations and other injuries complained of herein were proximately caused by a pattern and practice of misconduct and criminal activity across states which occurred with the consent and direction of Attorney Duncan separate, apart, and unnecessary to the litigation process. At all times relevant, Attorney Duncan was directly supervised by Attorney Drennan.

28.   Defendant Clotele Brantley, ("GAL Brantley"), is a licensed attorney through the Alabama State Bar. GAL Brantley is an adult resident of Jefferson County, Alabama. At all times relevant hereto, GAL Brantley was employed by herself and/or by Hardy Law Firm, LLC. The constitutional rights violations and other injuries complained of herein were proximately

caused by a pattern and practice of misconduct and criminal activity across states which occurred with the consent and direction of GAL Brantley separate, apart, and unnecessary to the litigation process.

29. Defendant Everett Wess, ("GAL Wess"), is a licensed attorney through the Alabama State Bar. GAL Wess is an adult resident of Jefferson County, Alabama. At all times relevant hereto, GAL Wess was employed by and an owner of Defendant The Wess Law Firm, P.C. The constitutional rights violations and other injuries complained of herein were proximately caused by a pattern and practice of misconduct and criminal activity across states which occurred with the consent and direction of GAL Wess separate, apart, and unnecessary to the litigation process.

30. Defendant Paige Yarbrough, ("Attorney Yarbrough"), is a licensed attorney through the Alabama State Bar. Attorney Yarbrough is an adult resident of Jefferson County, Alabama.  At all times relevant hereto, Attorney Yarbrough was employed by and is a Director of Defendant Crittenden Partners, a Domestic Professional Corporation. The constitutional rights violations and other injuries complained of herein were proximately caused by a pattern and practice of misconduct and criminal activity across states which occurred with the consent and direction of Attorney Yarbrough separate, apart, and unnecessary to the litigation process.

31.   Defendant Deborah Gregory, ("Attorney Gregory"), is a licensed attorney through the Alabama State Bar. Attorney Gregory is an adult resident of the state of Alabama. At all times relevant hereto, Defendant Deborah Gregory was employed by Defendant Crittenden Partners. The constitutional rights violations and other injuries complained of herein were proximately caused by a pattern and practice of misconduct and criminal activity across states which occurred with the consent and direction of Attorney Gregory separate, apart, and unnecessary to the litigation process.

32.   Defendant Laura Montgomery Lee, ("Attorney Montgomery Lee"), is a licensed attorney through the Alabama State Bar. Attorney Montgomery Lee is an adult resident of Jefferson County, Alabama. At all times relevant hereto, Defendant Laura Montgomery Lee was the Managing Partner of Defendant Crittenden Partners and responsible for supervising the roles of: Defendant Paige Yarbrough, Defendant Judith Crittenden, and Defendant Deborah Gregory. Defendant Laura Montgomery Lee, while dating him, represented Defendant Gary Lee in his divorce actions before Judge Chappell. Attorney Montgomery Lee is now married to Defendant Gary Lee. The constitutional rights violations and other injuries complained of herein were proximately caused by a pattern and practice of misconduct and criminal activity across states which occurred with the consent and direction

of Attorney Montgomery Lee separate, apart, and unnecessary to the litigation process.

33.     Defendant Judith Crittenden, ("Attorney Crittenden"), is a licensed attorney through the Alabama State Bar. Attorney Crittenden is an adult resident of the state of Alabama. At all times relevant hereto, Defendant Judith Crittenden was employed by Crittenden Partners as a Director in the Alabama Secretary of State's records and is co-counsel and co-conspirator to the constitutional rights violations complained to herein. The constitutional rights violations and other injuries complained of herein were proximately caused by a pattern and practice of misconduct and criminal activity across states which occurred with the consent and direction of Attorney Crittenden separate, apart, and unnecessary to the litigation process.

34.     Defendant Gary Lee, ("Attorney Lee"), is a licensed attorney through the Alabama State Bar. Attorney Lee is an adult resident of the state of Alabama. At all times relevant hereto, Defendant Gary Lee was employed by Defendant Wallace, Jordan, Ratliff & Brandt, LLC. Defendant Gary Lee conspired with his now-wife and co-counsel, Defendant Laura Montgomery Lee, to the constitutional rights violations complained to herein. The constitutional rights violations and other injuries complained of herein were proximately caused by a pattern and practice of misconduct and criminal

activity across states which occurred with the consent and direction of Attorney Lee separate, apart, and unnecessary to the litigation process.

35. Defendant Thomas McKnight, Jr., ("Attorney McKnight, Jr."), is a licensed attorney through the Alabama State Bar. Attorney McKnight, Jr. is an adult resident of the state of Alabama. At all times relevant hereto, Defendant Thomas McKnight, Jr. was employed by Defendant Wallace, Jordan, Ratliff & Brandt, LLC and is co-counsel and co-conspirator to the constitutional rights violations complained to herein. The constitutional rights violations and other injuries complained of herein were proximately caused by a pattern and practice of misconduct and criminal activity across states which occurred with the consent and direction of Attorney McKnight, Jr. separate, apart, and unnecessary to the litigation process.

36. Defendant Jay Clark, ("Attorney Clark"), is a licensed attorney through the Alabama State Bar. Attorney Clark is an adult resident of the state of Alabama. At all times relevant hereto, Defendant Jay Clark was employed by Wallace, Jordan, Ratliff & Brandt, LLC as the Managing Partner responsible for supervising the roles of: Defendant Gary Lee and Defendant Thomas McKnight, Jr. Defendant Jay Clark conspired with his employees to the constitutional rights violations complained to herein. The constitutional rights violations and other injuries complained of herein were proximately caused by a pattern and practice of misconduct and criminal activity across

states which occurred with the consent and direction of Attorney Clark separate, apart, and unnecessary to the litigation process.

37.   Defendant Renee Wilson, ("Ms. R. Wilson"), is an adult resident of the state of Maryland.   At all times relevant hereto, Ms. R. Wilson is an officer of Southern Maryland Dredging, Inc. and responsible for supervising Defendant Erika Goldman. Defendant Renee Wilson conspired with her employees to the constitutional rights violations complained to herein. The constitutional rights violations and other injuries complained of herein were proximately caused by a pattern and practice of misconduct and criminal activity across states which occurred with the consent and direction of Mr. R. Wilson.

38.   Defendant Compton Wilson, ("Mr. C. Wilson"), is an adult resident of the state of Maryland. At all times relevant hereto, Compton Wilson is an officer of Southern Maryland Dredging, Inc. and responsible for supervising Defendant Erika Goldman. Mr. C. Wilson conspired with his employees to the constitutional rights violations complained to herein. The constitutional rights violations and other injuries complained of herein were proximately caused by a pattern and practice of misconduct and criminal activity across states which occurred with the consent and direction of Mr. C. Wilson.

39.   Defendant Erika Goldman, ("Ms. E. Goldman"), is an adult resident of the state of Maryland. At all times relevant hereto, Erika Goldman is an

employee of Southern Maryland Dredging, Inc. Ms. E. Goldman conspired to the constitutional rights violations complained to herein. The constitutional rights violations and other injuries complained of herein were proximately caused by a pattern and practice of misconduct and criminal activity across states which occurred with the consent and direction of Ms. E. Goldman.

40.    Defendant Michael Labellarte, ("Dr. Labellarte"), is an adult resident of the state of Maryland. At all times relevant hereto, Dr. Labellarte is a licensed medical doctor member of CPE Clinic, LLC. The constitutional rights violations and other injuries complained of herein were proximately caused by a pattern and practice of misconduct and criminal activity across states which occurred with the consent and direction of Dr. Labellarte.

41.    Defendant Dale Maynard, ("Ms. D. Maynard"), is an adult resident of the state of Maryland. At all times relevant hereto, Ms. D. Maynard is a licensed counselor in Maryland (LCPC) and an owner of Hope for Healing, LLC. The constitutional rights violations and other injuries complained of herein were proximately caused by a pattern and practice of misconduct and criminal activity across states which occurred with the consent and direction of Ms. D. Maynard.

42.    Defendant David Kellner, ("Mr. D. Kellner"), is an adult resident of the state of Maryland. At all times relevant hereto, Mr. D. Kellner is a licensed

counselor in Maryland (LCPC) and an owner of Solace Family Counseling, LLC. The constitutional rights violations and other injuries complained of herein were proximately caused by a pattern and practice of misconduct and criminal activity across states which occurred with the consent and direction of Mr. D. Kellner.

43. Defendant Deegan Malone, ("Ms. D. Malone"), is an adult resident of the state of Alabama. At all times relevant hereto, Ms. D. Malone is a Licensed Professional Counselor (No. 2213) and LPC Supervisor (No. 565) in Alabama. The constitutional rights violations and other injuries complained of herein were proximately caused by a pattern and practice of misconduct and criminal activity across states which occurred with the consent and direction of Ms. D. Malone.

44. Defendant Andrea Weiss, ("Ms. A. Weiss"), is an adult resident of the state of Maryland. Ms. A. Weiss was Head of School for St. Anne's Episcopal School and responsible for supervising the role of Connie Coker when she falsely imprisoned J.K.D. The constitutional rights violations and other injuries complained of herein were proximately caused by a pattern and practice of misconduct and criminal activity across states which occurred with the consent and direction of Ms. A. Weiss.

45. Defendant Connie Coker, ("Ms. C. Coker"), is an adult resident of the state of Maryland. During the acts complained of herein, Ms. C. Coker was

Assistant Head of School and later became Interim Head of School for St. Anne's Episcopal School. The constitutional rights violations and other injuries complained of herein were proximately caused by a pattern and practice of misconduct and criminal activity across states which occurred with the consent and direction of Ms. C. Coker.

46. Defendant Alan Blotcky, ("Dr. Blotcky"), is an adult resident of the state of Alabama and licensed through the Alabama Board of Examiners in Psychology. At all times relevant hereto, Dr. Blotcky is a Licensed Psychologist (#430) in Alabama that failed to follow APA guidelines in an investigation that directly affected the minor children. The constitutional rights violations and other injuries complained of herein were proximately caused by a pattern and practice of misconduct and criminal activity across states which occurred with the consent and direction of Dr. Blotcky.

47. Defendant Wendy Crew, ("Attorney Crew"), is an adult resident of the state of Alabama and licensed through the Alabama State Bar. At all times relevant hereto, Attorney Crew was employed by Crew Gentle Law, PC as Director.  Although Attorney Crew represented that she was employed by Crew Law Group, including accepting and disbursing funds from Crew Law Group Trust Account, Crew Law Group does not appear in the Alabama Secretary of State registry of entities as of the time of this filing. The constitutional rights violations and other injuries complained of herein were

proximately caused by a pattern and practice of misconduct and criminal activity across states which occurred with the consent and direction of Attorney Crew separate, apart, and unnecessary to the litigation process.

48. Defendant Christina Vineyard, ("Attorney Vineyard"), is an adult resident of the state of Alabama and licensed through the Alabama State Bar. At all times relevant hereto, Attorney Vineyard represented she was employed by Crew Law Group. Crew Law Group does not appear in the Alabama Secretary of State registry of entities as of May 15, 2023. The constitutional rights violations and other injuries complained of herein were proximately caused by a pattern and practice of misconduct and criminal activity across states which occurred with the consent and direction of Attorney Vineyard separate, apart, and unnecessary to the litigation process.

49. Defendant Marcus Jones, ("Attorney Jones"), is an adult resident of the state of Alabama and licensed through the Alabama State Bar. The constitutional rights violations and other injuries complained of herein were proximately caused by a pattern and practice of misconduct and criminal activity across states which occurred with the consent and direction of Attorney Jones separate, apart, and unnecessary to the litigation process.

50. Defendant Madison Brantley, ("JA Brantley"), is an adult resident of the state of Alabama and daughter of Defendant Clotele Brantley. JA Brantley reports to have been the Judicial Assistant to Defendant Agnes Chappell

from September 2021 until January 2023.  JA Brantley through her role in Judge Chappell's court had access to confidential documents of all of the minor child Plaintiffs and knowingly made false statements before the presiding court in which she worked. The constitutional rights violations and other injuries complained of herein were proximately caused by a pattern and practice of misconduct and criminal activity across states which occurred with the consent and direction of JA Brantley.

51.   Defendant Craig Langrall, ("Mr. C. Langrall"), is an adult resident of the state of Maryland. Mr. C. Langrall was disbarred in the state of Maryland after stealing his client's money in a family court case in Maryland. The constitutional rights violations and other injuries complained of herein were proximately caused by a pattern and practice of misconduct and criminal activity across states which occurred with the consent and direction of Mr. C. Langrall.

52.   Defendant Carolyn Wyatt, ("Ms. C. Wyatt"), is an adult resident of the state of Alabama. The constitutional rights violations and other injuries complained of herein were proximately caused by a pattern and practice of misconduct and criminal activity across states which occurred with the consent and direction of Ms. C. Wyatt.

53.   Defendant Gary Wyatt, ("Mr. G. Wyatt"), is an adult resident of the state of Alabama. The constitutional rights violations and other injuries complained

of herein were proximately caused by a pattern and practice of misconduct and criminal activity across states which occurred with the consent and direction of Ms. G. Wyatt.

54. Defendant R. Eric Mashburn, ("Dr. Mashburn"), is an adult resident of the state of Alabama and licensed through the Alabama Board of Examiners in Psychology. At all times relevant hereto, Dr. Mashburn is a Licensed Psychologist (#1258) in Alabama. The constitutional rights violations and other injuries complained of herein were proximately caused by a pattern and practice of misconduct and criminal activity across states which occurred with the consent and direction of Dr. Mashburn.

55. Defendant Caroline Taylor, ("Ms. C. Taylor"), is an adult resident of the state of Alabama. The constitutional rights violations and other injuries complained of herein were proximately caused by a pattern and practice of misconduct and criminal activity across states which occurred with the consent and direction of Ms. C. Taylor.

56. Defendant Kim Davidson, ("Attorney Davidson"), is an adult resident of the state of Alabama and licensed through the Alabama State Bar. The constitutional rights violations and other injuries complained of herein were proximately caused by a pattern and practice of misconduct and criminal activity across states which occurred with the consent and direction of Attorney Davidson separate, apart, and unnecessary to the litigation process.

57.   Defendant Heather Fann, ("Attorney Fann"), is an adult resident of the state of Alabama and licensed through the Alabama State Bar. The constitutional rights violations and other injuries complained of herein were proximately caused by a pattern and practice of misconduct and criminal activity across states which occurred with the consent and direction of Attorney Fann separate, apart, and unnecessary to the litigation process.

58.   Defendant Terri Miller, ("Ms. T. Miller"), is an adult resident of the state of Maryland. At all times relevant hereto, Defendant Terri Miller is a licensed counselor in Maryland (LCPC). Defendant The constitutional rights violations and other injuries complained of herein were proximately caused by a pattern and practice of misconduct and criminal activity across states which occurred with the consent and direction of Ms. T. Miller.

59.   Defendant Kirk.Drennan, P.C. ("Kirk.Drennan") is a Domestic Corporation with its principal place of business in Birmingham, AL and was at all times material to this complaint doing business in Jefferson County, Alabama. Under information and belief Kirk.Drennan is owned by Attorney Drennan.

60.   Defendant Crittenden Partners, P.C. ("Crittenden Partners") is a Domestic Professional Corporation with its principal place of business in Birmingham, AL and was at all times material to this complaint doing business in Jefferson County, Alabama.

61.    Defendant Wallace, Jordan, Ratliff & Brandt, L.L.C. ("Wallace Jordan") is a Domestic Limited Liability Corporation with its principal place of business in Birmingham, AL and was at all times material to this complaint doing business in Jefferson County, Alabama.

62.    Defendant St. Anne's School of Annapolis, Incorporated ("St. Anne's School") is a Corporation with its principal place of business in Annapolis, MD and was at all times material to this complaint doing business in Anne Arundel County, Maryland.

63.    Defendant Southern Maryland Dredging, Inc. ("Southern Maryland Dredging") is a Corporation with its principal place of business in Friendship, MD and was at all times material to this complaint doing business in Anne Arundel County, Maryland.

64.    Defendant CPE Clinic, LLC ("CPE Clinic") is a Domestic LLC with its principal place of business in Baltimore, MD and was at all times material to this complaint doing business in Baltimore County, Maryland.

65.    Defendant Hope for Healing, LLC ("Hope for Healing") is a Domestic LLC with its principal place of business in Annapolis, MD and was at all times material to this complaint doing business in Anne Arundel County, Maryland.

66.    Defendant Solace Family Counseling, LLC ("Solace Family Counseling") is a Domestic LLC with its principal place of business in Bowie, MD and was

at all times material to this complaint doing business in Anne Arundel County, Maryland.

67.   Defendant Bay Area Christian Counseling ("Bay Area Christian Counseling") is a corporation that has its principal place of business in Annapolis, MD. At all times material to this complaint, Bay Area Christian Counseling was doing business in Anne Arundel County, Maryland.

68.   Defendant Crew Gentle Law, P.C. ("Crew Gentle Law") is a Domestic Professional Corporation with its principal place of business in Birmingham, AL and was at all times material to this complaint doing business in Jefferson County Alabama.

69.   Defendant Crew Law Group ("Crew Law Group") is operated by Wendy Crew with its principal place of business in Birmingham, AL and was at all times material to this complaint doing business in Jefferson County Alabama. Crew Law Group operates Crew Law Group Trust Account receiving and disbursing funds from clients despite no record of Crew Law Group existing with the Alabama Secretary of State.

70.   Defendant Caroline O. Taylor, P.C. ("Caroline O. Taylor") is a Domestic Limited Liability Corporation with its principal place of business in Birmingham, AL and was at all times material to this complaint doing business in Jefferson County Alabama.

71.  Defendant Alan D. Blotcky, Ph.D., LLC ("Alan D. Blotcky, Ph.D., LLC") is a Domestic Limited Liability Corporation with its principal place of business in Birmingham, AL and was at all times material to this complaint doing business in Jefferson County Alabama.

72.  Defendant The Hardy Law Firm, LLC ("Hardy Law Firm") is a Domestic Professional Corporation with its principal place of business in Birmingham, AL and was at all times material to this complaint doing business in Jefferson County Alabama.

73.  Defendant The Wess Law Firm, P.C.  ("Wess Law Firm") is a Domestic Professional Corporation with its principal place of business in Birmingham, AL and was at all times material to this complaint doing business in Jefferson County Alabama.

74.  Defendant Kim Davidson Law Office, LLC ("Davidson Law Office") is a Domestic Limited Liability Company with its principal place of business in Birmingham, AL and was at all times material to this complaint doing business in Jefferson County Alabama.

**Table 1 – The Association and Defendant's Role in Association**

| __Role__ | __Association injuring Mr. D. Deaton, J.K.D, L.W.D., and R.E.D.__ | __Association injuring Ms. T. Peake and G.M.W.__ |
|---|---|---|
| Judges and Judicial Assistant | Judge Stephens | Judge Chappell, JA Brantley, Judge May |
| Guardian Ad Litem | GAL Brantley | GAL Wess |
| Attorneys | Attorney Drennan, Attorney Duncan, Attorney Crew, Attorney Vineyard, Attorney Jones, Attorney Davidson | Attorney Yarbrough, Attorney Gregory, Attorney Montgomery Lee, Attorney Crittenden, Attorney Lee, Attorney McKnight, Jr., Attorney Clark, Attorney Fann |
| Medical Providers directed by court appointees | Dr. Labellarte, Ms. D. Maynard, Mr. D. Kellner, Ms. D. Malone, Dr. Blotcky, Ms. T. Miller | Dr. Mashburn, Ms. C. Taylor |
| Bribed Officers of the Court | Mr. C. Wilson, Ms. R. Wilson, Ms. E. Goldman | Ms. C. Wyatt, Mr. G. Wyatt |
| School and school transportation directed by court appointees | Ms. A. Weiss, Ms. C. Coker, Mr. C. Langrall | |

**Table 2 – Defendant's Entity in Association**

| **Defendant** | **Entity** |
| --- | --- |
| Attorney Drennan, Attorney Duncan | Kirk.Drennan, P.C. |
| Attorney Crittenden, Attorney Montgomery Lee, Attorney Yarbrough, Attorney Gregory | Crittenden Partners, P.C. |
| Attorney Clark, Attorney Lee, Attorney McKnight, Jr. | Wallace, Jordan, Ratliff & Brandt, L.L.C. |
| Ms. A. Weiss, Ms. C. Coker | St. Anne's School of Annapolis, Incorporated |
| Mr. C. Wilson, Ms. R. Wilson, Ms. E. Goldman | Southern Maryland Dredging, Inc. |
| Ms. D. Maynard | Hope For Healing, LLC |
| Mr. D. Kellner | Solace Family Counseling, LLC |
| Dr. Labellarte | CPE Clinic, LLC |
| Ms. T. Miller | Bay Area Christian Counseling |
| Attorney Crew, Attorney Vineyard | Crew Gentle Law, P.C., Crew Law Group |
| Ms. C. Taylor | Caroline O. Taylor P.C. |
| GAL Brantley | The Hardy Law Firm, LLC |
| GAL Wess | The Wess Law Firm, P.C. |
| Attorney Davidson | Kim Davidson Law Office LLC |
| Dr. Blotcky | Alan D. Blotcky, Ph.D., LLC |

## FACTS

75.   Ms. T. Peake and Mr. D. Deaton both have a child or children from a previous marriage.

76.   Ms. T. Peake and Mr. D. Deaton were married on June 29, 2019.

77.   During the trip to celebrate their wedding, all of the minor children bonded and discussed concerning and shocking issues occurring in their other parent's home.

78.   Over the next few weeks, Ms. T. Peake and Mr. D. Deaton learned of additional facts that supported their concerns and sought relief from the Jefferson County Circuit Court Domestic Relations Division.

79.   Instead of protecting the children, the follow series of illegal and unethical events occurred.

BACKGROUND

(A Timeline of Events and How It Happened)

**A.     Attorney Montgomery Lee and Attorney Lee's Affair and Collusion to Defraud.**

80.     Attorney Montgomery Lee and her now husband, Attorney Lee, were romantically involved when Attorney Montgomery Lee was representing Attorney Lee as legal counsel in his divorce.

81.     Attorney Lee's divorce case took place in part before Judge Chappell's court.

82.     At all times relevant, Judge Chappell was directly supervised by Judge Stephens in Judge Stephens' role as the Presiding Judge of Domestic Relations Court in Jefferson County, Alabama.

83.     Attorney Montgomery Lee and Attorney Lee conspired together to litigate against his then-wife, who was suffering from a breast cancer diagnosis.

84.     Said litigation involved Attorney Lee's ex-wife paying hundreds of thousands of dollars from her retirement account to Attorney Lee, while his girlfriend, Attorney Montgomery Lee, was serving as his attorney.

85.     On November 22, 2016, Attorney Montgomery Lee signed the divorce agreement on behalf of Attorney Lee, her then-boyfriend and now-husband before the trial court in the Tenth Judicial Circuit Court of Jefferson County.

86.   On December 28, 2016, the trial court in the Tenth Judicial Circuit Court of Jefferson County in Alabama entered the Final Judgment of Divorce for Attorney Lee.

87.   At some time on or around January 2017, Judge Chappell took the bench at the Tenth Judicial Circuit Court of Jefferson County in Alabama.

88.   At least on or before January 12, 2017 and on every date following, Attorney Montgomery Lee intentionally suppressed material facts to the Alabama State Bar and Attorney Lee's ex-wife regarding the state of Attorney Montgomery Lee's romantic relationship with her client, Attorney Lee.

89.   Attorney Lee and Attorney Montgomery Lee worked together to request and ultimately file a joint motion wherein Attorney Montgomery Lee's signature is attached before Judge Chappell's court on her then-boyfriend and now husband's divorce case.

90.   Judge Chappell entered an order for a Qualified Domestic Relations Order on May 11, 2017 while Attorney Montgomery Lee was serving as counsel for Attorney Lee in his divorce.

91.   Months following the entry of the order and leading up to the announcement of Attorney Lee and Attorney Montgomery Lee's wedding, both defendants later admitted that they were dating on or before January 12, 2017.

92.    Firms Wallace Jordan and Crittenden Partners colluded to increase billings gained from Attorney Montgomery Lee and Attorney Lee's unethical legal representation and referrals during and after their personal affair.

**B.    Crittenden Partners - The Link Between the Deaton and Peake/Wyatt Custody Cases.**

93.    Attorney Montgomery Lee is the managing partner at the law firm, Crittenden Partners.

94.    On or around March 2018, Ms. T. Peake consulted with Attorney Montgomery Lee regarding Ms. T. Peake's anticipated divorce, including to discuss her jointly owned business and business interests.

95.    In this consultation, Ms. T. Peake shared confidential and privileged information regarding her divorce, custody concerns, and concerns surrounding the jointly owned businesses.

96.    Following this consultation and the divorce of Ms. T. Peake and Mr. S.Wyatt, Ms. T. Peake filed a post-divorce custodial case.

97.    Crittenden Partners appeared as legal counsel for Mr. S. Wyatt on or around August 2019.

98.    The standard of care required Attorney Montgomery Lee to keep the information learned in confidence, to not use it against Ms. T. Peake in any future engagement, and to not take a position materially adverse to Ms. T. Peake related to these facts.

99.  Attorney Montgomery Lee, Attorney Crittenden, Attorney Gregory, Attorney Yarbrough, and Crittenden Partners breached the standard of care a) by sharing the information learned in confidence, b) by using the information divulged in confidence against Ms. T. Peake in a future representation of Mr. S. Wyatt, and c) taking a position materially adverse to Ms. T. Peake which arose from the same or substantially similar as discussed in the consultation.

100. Each of those breaches were in violation of the Alabama Rules of Professional Conduct governing attorneys and were in violation of the relevant standard of care.

101. But for their possession of the information gained in confidence, Mr. S. Wyatt would not have been able to prevail against Ms. T. Peake in their post-divorce litigation.

102. In fact, Mr. S. Wyatt alleged that no other attorney in Alabama could possibly represent him except for the Crittenden Partners and further litigated to keep them in the case.

103. Crittenden Partners remain involved in the post-divorce litigation between Ms. T. Peake and Mr. S. Wyatt as of the time of this filing.

104. On or around the same time, Crittenden Partners was also retained by Ms. L. Deaton, but did not file a notice of appearance in the Deaton case.

105. Instead, Crittenden Partners shared information between the two cases and met with GAL Brantley and GAL Wess to attempt to co-mingle the cases, causing chaos and substantially increasing fees of all of the Plaintiffs.

106. Fearing collusion between the defendants, Ms. T. Peake filed with the Alabama Court of Civil Appeals on or around January 25, 2021.

107. Crittenden Partners hired Attorney Robert Mackenzie; the attorney frequently used by The Enterprise as a fixer.

108. Attorney Montgomery Lee made false statements to the Alabama Court of Civil Appeals, which The Alabama Court of Civil Appeals relied upon is its opinion.

109. On or around April 30, 2021, The Alabama Court of Civil Appeals did not hold any opinion that their representation was proper, instead they held, for purposes of what they ruled on as a mandamus, that Plaintiff Peake waived the issue by the passage of time only as it related to their removal.

110. Following the ruling from the Alabama Court of Civil Appeals and their false statements in multiple tribunals, Attorney Montgomery Lee and her co-defendants at Crittenden Partners continued forth with their unconstitutional, unethical, and illegal acts to increase their profits.

**C. Collusion Between Law Firms: Crittenden Partners and Wallace Jordan.**

111.  Crittenden Partners recommended Mr. S. Wyatt seek additional legal counsel as it related to a business that was discussed between Ms. T. Peake and Attorney Montgomery Lee one year prior.

112.  Crittenden Partners referred Mr. S. Wyatt to Attorney Lee, their managing partner's husband.

113.  Attorney Lee is an attorney at Wallace Jordan.

114.  Attorney Lee filed a lien in the original Peake/Wyatt divorce action against Ms. T. Peake's business, in which his wife provided a consultation on the same matter one year prior.

115.  Attorney Lee received multiple contingency based payments from Wallace Jordan from the referral from his now-wife's firm that directly benefitted the Lee household.

116.  In an effort to further the criminal, unethical, and unconstitutional conspiracy, Defendants Attorney Lee and Attorney Montgomery Lee used their position as Officers of the Court to defraud the Plaintiffs of their money and their protected constitutional rights to raise their children.

117.  Attorney McKnight, Jr. worked as co-counsel with Attorney Lee in these pleadings and court appearance regarding Ms. T. Peake's business and, upon information and belief, also received commission-based payments from Wallace Jordan and benefitted from furthering the scheme to defraud.

118.  Attorney McKnight, Jr. knew and directly acknowledged that this referral was from Attorney Lee's wife's firm.

119.  Attorney McKnight, Jr. further knew that there was a dispute over the conflicted nature of the legal representation and took no steps to resolve the issue.

120.  With unclean hands, Attorney McKnight, Jr., continued his representation and increased damage to the Plaintiffs.

121.  Wallace Jordan and their managing partner, Attorney Clark, were put on notice of the conflict on multiple occasions, including but not limited to, when Ms. T. Peake reported that Attorney Lee was refusing to facilitate settlement offers in letters or emails sent on: April 28, 2022, July 11, 2022, and July 20, 2022.

122.  Wallace Jordan and Attorney Clark knew or should have known at all times relevant that Attorney Lee was having romantic relations with his attorney, Attorney Montgomery Lee, that represented him in his own divorce in front of Judge Chappell.

123.  Multiple attorneys at Wallace Jordan were receiving filings wherein these issues were raised, but they made no attempts to stop or correct these obvious ethics violations.

124.  When Ms. T. Peake provided notice to Wallace Jordan, Attorney Lee, Attorney McKnight, Jr., and Attorney Clark of this continued ethical

misconduct, Attorney Lee retaliated by, among other things, name calling before Judge Chappell.

125.  Then in August 2022 in further retaliation, Attorney Lee filed a motion before Judge Chappell asking to restrict Ms. T. Peake's right to subpoena documents or witnesses in the custody case for her child.

126.  Attorney Lee continued a pattern of unprofessional language berating Ms. T. Peake and making unlawful requests in front of Judge Chappell.

127.  When faced with the possibility of a new judge given Judge Chappell's retirement, Attorney Lee questions on the record:

 "Would the idea with that be that that's heard by Your Honor personally after this?" (Trial Transcript, 9 Nov 2022, p. 8, 4:6)

128.  Attorney Lee knew that in front of a fair tribunal, who was not a participant in The Enterprise, this type of unethical behavioral would not be allowed to occur.

**D. Court of the Judiciary Removes Nakita Blocton from Office for Bad Acts.**

129.  In 2018, Judge Blocton was assigned Mr. D. Deaton and Ms. L. Deaton divorce case.

130.  In 2019, Judge Blocton was assigned Mr. D. Deaton and Ms. L. Deaton's post divorce custodial case.

131.  On December 10, 2021, in the Alabama Court of the Judiciary, Judge Nakita Blocton was removed from office for bad acts.

132. Judge Blocton originally appointed GAL Brantley.

133. At all times relevant, Judge Blocton was directly supervised by Judge Stephens including when Blocton was removed from the bench.

134. A specially appointed judge described this period of delay as appalling, wherein Mr. D. Deaton and minor children Plaintiffs L.K.D., L.W.D., and R.E.D. were directly affected.

135. This was allowed to occur at the hands and direct supervision of Judge Stephens.

136. Blocton hired Attorney Robert Mackenzie as counsel for her case before the Court of the Judiciary. The attorney frequently used by The Enterprise as a fixer.

137. Specifically, in the Alabama Court of the Judiciary's *Findings and Conclusions* in their final order entered on December 10, 2021, they stated in part:

    "This Court does find, however, that the Commission proved by clear and convincing evidence that Judge Blocton engaged in *ex parte* communications and that she engaged in a pattern and practice of making inappropriate comments - for example, calling one judge an "Uncle Tom" and another judge a "fat bitch" and calling an employee a "heifer."

This Court also finds that the Commission proved by clear and convincing evidence that Judge Blocton engaged in a pattern of abuse of staff, attorneys, and

litigants. For example, Judge Blocton referred to one employee as a "heifer" and verbally abused and belittled another employee. Judge Blocton also ordered employees to allow her to see their private cell phones so that information that might be relevant to the Commission's investigation could be deleted and she instructed them to provide to her their private login information to their work computers.

Additionally, Judge Blocton made her employees work unreasonable hours, including excessive, unproductive, and unnecessary late nights and weekends, and she made repeated threats to fire employees in an attempt to intimidate them. Judge Blocton also called an attorney, forcing the attorney to beg Judge Blocton not to fire an employee who had spoken with a litigant about the harm she had suffered due to the delay in resolving the litigant's case.

This Court also finds that the Commission has proved by clear and convincing evidence that Judge Blocton used several Facebook aliases to communicate with litigants in a pending domestic-relations case in an effort to affect the outcome of the case.

This Court further finds that the Commission has proved by clear and convincing evidence that, although she spent a substantial amount of time in her office, Judge Blocton failed to promptly dispose of many of the cases assigned to her, and that Judge Blocton is unable to effectively remedy her backlog of cases. Two judges were specially appointed to handle Judge Blocton's backlog after she left office in

February 2021. One  judge, who acknowledged that domestic-relations judges in Jefferson County have a high caseload, said that she was "appalled" by the number of Judge Blocton's cases that had been pending for an inappropriate amount of time without resolution.

The other judge testified that it was clear that Judge Blocton had not established an effective way of handling cases, and he noted the adverse effect that the unreasonable delay in  disposing of cases had on the citizens of Jefferson County and testified that the inordinate delays "gave a black-eye" to the judicial system.

 This Court also finds that the Commission has proved by clear and  convincing evidence that Judge Blocton engaged in a pattern of dishonesty and deception. This behavior included Judge Blocton's use of Facebook aliases to communicate directly with litigants and to provide  information to litigants in cases, asking potential witnesses to delete  evidence relevant to the Commission's investigation, and attempting to  influence the testimony of witnesses (or potential witnesses) in this matter."

**E.     Assault in an Uber.**

138.   On April 22, 2019, Ms. L. Deaton assaulted Mr. D. Deaton at an exchange of the minor children.

139.   Without invitation, Ms. L. Deaton launched herself into Mr. D. Deaton's Uber, grabbed his shoulder, and refused to leave the vehicle in front of the children.

140.   Following this event, on June 17, 2019, Judge Laura Robinson in the District Court of Maryland, District for Glen Burnie, found Ms. L. Deaton to be non-credible. The court entered a protective/restraining order following her assault.

141.   Judge Laura Robinson in the District Court of Maryland stated from the bench:

"In fact, on the video, what we do see is ostensibly -- I can't see Mr. Deaton in the van, but everybody agrees that's him in the van, on the side of the van where Ms. Deaton is. Ms. Deaton does have her leg up on the van….But it is very much a position of dominance and so then we look at the contest with regard to Mr. Deaton of a long history of abuse. There are photographs depicting abuse, there is an invocation of the right to remain silent on physically abusing Mr. Deaton and so therefore, it's an acknowledgment almost, tacitly that there has been a domestic violence by Ms. Deaton to Mr. Deaton and that is the context of this interaction.

At some point, Ms. Deaton takes herself to the side of Mr. Deaton and this is where I have a real problem with Ms. Deaton's credibility. The video that was initiated by the sister, Ms. Goldman, Ms. Deaton explained as what was being filmed was excitement to greet the children. That was her characterization of their approach up to the vehicle. I think that's not a credible characterization, period. There was no excitement to greet the children. If there was, there wouldn't have been

conversations about car seats and approaching the  Uber driver about business cards. This wasn't filming the great reunion. That is not what happened.

And I have a problem in terms of credibility with the  testimony describing it that way. I also have a problem with  the testimony of Ms. Deaton indicating that she wanted a  constructive relationship, that things were going wrong and  that she wanted to yield and olive branch. An olive branch  doesn't look like a video recording asking an Uber driver about a business card, emails regarding child seats and then walking  over to the van on his side. That's not an olive branch.  And additionally, that olive branch came in the context of an invocation of the right to remain silent on secretly  recording a conversation. People don't secretly record their  olive branches.  For all the reasons I've indicated, I do believe that  Mr. Deaton, although it is a de minimis battery, the context  matters. This was an offensive physical touching and I do so   find. The Court's going to grant the protective order. No abuse, no threaten to abuse."

142.   Ms. L. Deaton has a history of mental health issues, including but not limited to, episodes of outrage that include outbursts and physical assault of hitting, kicking, and screaming obscenities, episodes of withdrawal, episodes of hallucinations and an inability to perform basic functions such as walking or standing up during these episodes. Ms. L. Deaton's mental health issues surfaced on many occasions in front of the minor children.

143. Prior to and following this incident, Attorney Drennan would frequently refer to Ms. L. Deaton in derogatory terms such as "scared rabbit".

144. The Alabama court appointed GAL, GAL Brantley, would join in calling Ms. L. Deaton "milly-moused" [sic] to encourage Ms. L. Deaton to continue to be more and more aggressive, which furthered the litigation and increased profits for The Enterprise.

145. Attorney Drennan, Attorney Duncan, and GAL Brantley were aware of and directly experienced Ms. L. Deaton's fragile, emotional, and mental state and used this to rest control of the litigation from Ms. L. Deaton so as to maximum their profits and ensure a never-ending nature of the proceedings.

146. For example, Attorney Drennan and repeatedly stated that she reviews or edits all of Ms. L. Deaton's emails before they are sent to Mr. D. Deaton.

147. Ms. L. Deaton has confirmed that GAL Brantley is contacted and consulted about each custodial exchange of the minor chidlren.

148. During Ms. L. Deaton's sworn testimony on May 5, 2023, Ms. L. Deaton had to attempt to count how many times the police had been involved in the state of Maryland in front of the children.

**F.    The Preschool Shakedown.**

149. On or around August 27, 2019, Attorney Drennan appeared at Edgewood Elementary School with Ms. L. Deaton.

150. Attorney Drennan entered Edgewood Elementary School and removed Plaintiff children J.K.D. and L.W.D. from the premises.

151. The children were not sick, and Attorney Drennan was on-site with Ms. L. Deaton displaying aggressive behavior in front of the children.

152. Upon information and belief, Attorney Drennan took Plaintiff J.K.D. and L.W.D. into a vehicle without both parent's consent and left.

153. During this time, an Alabama Department of Human Resources investigation was underway to determine what alleged abuse was occurring in Ms. L. Deaton's household.

154. Attorney Drennan assisted Ms. L. Deaton in removing J.K.D. and L.W.D. from the state of Alabama.

155. At all times relevant, Attorney Drennan knew or should have known that this Alabama Department of Human Resources investigation was underway for the benefit of J.K.D., L.W.D., and R.E.D., as Attorney Drennan discussed the attempted Alabama Department of Human Resources investigation at the courthouse the next day.

156. Plaintiff children G.M.W. and R.E.D. attended South Highland Child Development Center ("S.H.C.D.C.") for preschool in August 2019.

157. On August 27, 2019, Attorney Drennan and Ms. L. Deaton appeared at the preschool creating a disturbance on the S.H.C.D.C. campus.

158. Attorney Drennan's actions were severe enough that school officials acted to ensure all minor children were safe in rooms away from Attorney Drennan's screaming demands.

159. Upon information and belief, on August 27, 2019, Attorney Drennan was screaming and waving "paperwork" in the face of the preschool's Executive Director attempting to the bully their staff into her demands.

160. Attorney Drennan attempted to remove R.E.D. from her preschool.

161. Attorney Drennan alleged that she saw R.E.D. leave the preschool with her father when she arrived, and S.H.C.D.C. clearly stated R.E.D. left with her father.

162. Attorney Drennan did not explain why Mr. D. Deaton would not be allowed to pick up his child from school.

163. Instead, Attorney Drennan, knowing the statement was false, misrepresented to S.H.C.D.C. the custodial agreement of R.E.D.

164. Ms. L. Deaton later provided sworn testimony that as a legal guardian, Mr. D. Deaton would be entitled to pick up his child from school.

165. GAL Brantley knew at all times relevant that Ms. L. Deaton left the state with J.K.D. and L.W.D. without allowing the Alabama Department of Human Resources to interview them as requested at that time.

166. Almost two years after this incident, on August 25, 2021, Ms. L. Deaton filed a lawsuit against the S.H.C.D.C. preschool for allowing the child's

custodial father, Mr. D. Deaton, to pick up Plaintiff R.E.D. naming her attorney, Attorney Drennan, as her key witness.

167.  At the time of this filing and at all relevant times prior, Attorney Drennan represents Ms. L. Deaton as her attorney of record on post-divorce custodial matters.

168.  It is unclear how Attorney Drennan is going to manage playing the role of "key witness" and "attorney" in these issues affecting the minor children.

169.  GAL Brantley was made aware and put on notice of Ms. L. Deaton's claims of severe mental anguish levied against the preschool, but GAL Brantley did not inform the tribunal.

170.  Encouraged by Attorney Drennan, Ms. L. Deaton's lawsuit against S.H.C.D.C. demands financial damages from the church preschool for Ms. L. Deaton's "severe mental anguish".

171.  Regarding Ms. L. Deaton's alleged claims, the Hon. Brown Green's order entered on or around January 23, 2023 reads in part: There is no cognizable set of facts that would entitle Plaintiff to relief on her claims against the Defendants for negligence and wantonness. For these reasons, the Defendants' Motion to Dismiss Plaintiff's claims for negligence and wantonness under Rule 12(b)(6) Alabama Rules of Civil Procedure is GRANTED.

172. Attorney Drennan continues to encourage and direct additional legal action, including the current crossclaim against Mr. D. Deaton, in which Attorney Drennan is also a key witness in actions pending before the tribunal.

173. Ms. L. Deaton filed her fourth (and third amended complaint) in her lawsuit against S.H.C.D.C., the church preschool, on February 9, 2023.

**G.      Defendant GAL Brantley's Appointment.**

174. GAL Brantley was appointed as the guardian ad litem of the Plaintiff children J.K.D, L.W.D, and R.E.D on August 29, 2019, by Jefferson County Circuit Judge Nakita Blocton.

175. Blocton's appointment of GAL Brantley came as a surprise since the Plaintiff children had previously been represented by a different GAL previously.

176. As part of their conspiratorial efforts, Attorney Drennan requested a change of GAL and recommended GAL Brantley although no change was warranted or proven.

177. On December 10, 2021, Judge Blocton was removed from the bench for bad acts while being directly supervised by Judge Stephens. Those bad acts included but were not limited to, *ex parte* communication and the mistreatment of litigants and attorneys before her court.

178. In the proceedings before the Judicial Inquiry Committee, it was determined that Judge Blocton and others had used social media and messaging apps to

further engage in *ex parte* communications in an effort to predetermine the outcome of matters before the court.

**H.    Children's Testimony.**

179.    On August 30, 2019, the minor children J.K.D., L.W.D., and R.E.D. testified in the Jefferson County Circuit Court Domestic Relations Division.

180.    The children's testimony centered around actions that took place while they had primarily been in the care of Ms. L. Deaton.

181.    This testimony was extremely concerning to the court and all in attendance.

182.    Ms. L. Deaton alleged she was unaware of the events they described, but her children's testimony confirmed that she was unquestionably aware of the troubling events.

183.    Attorney Drennan demanded the hearing continue with Mr. D. Deaton's counsel not present and out-of-state against what she knew to be a violation of well settled substantive and procedural due process laws.

184.    Judge Blocton heard testimony over Mr. D. Deaton's objection to his attorney being out-of-state and unable to attend.

185.    Based on this testimony, Blocton separated the minor children.

186.    Judge Blocton placed L.W.D. and Plaintiff R.E.D. with Mr. D. Deaton.

187.    J.K.D. was placed with Ms. L. Deaton.

188.    Dialectical Behavior Therapy was ordered for J.K.D.

189. Four years later, Ms. L. Deaton never scheduled an appointment or taken Plaintiff J.K.D to Dialectical Behavior Therapy at any time against a court order and against her own agreement.

## I.   GAL Brantley Directed Violations of a Maryland Protection Order and Directed Changes to Mr. D. Deaton's Custodial Time with His Children.

190. Following Ms. L. Deaton's assault on Mr. D. Deaton, GAL Brantley directed Ms. L. Deaton to violate a Maryland protection order on dozens of occasions to prevent Mr. D. Deaton from his physical custodial time with his children.

191. These incidents include, but are not limited to, the examples detailed below.

192. While the June 17, 2019 Maryland Court Ordered Protection From Abuse was in effect because of Defendant L Deaton's assault of Mr. D. Deaton (*See above "*Assault in an Uber*"*), GAL Brantley would only speak to Mr. D. Deaton regarding coordinating visitation of his children in the presence of Ms. L. Deaton instead of communicating through legal counsel as agreed.

193. On December 7, 2019, GAL Brantley demanded last minute changes to the Mr. D. Deaton's custodial schedule to exchange Plaintiffs L.W.D. and R.E.D. requiring communication go directly through Ms. Leanne Deaton and GAL Brantley instead of communication through legal counsel as agreed.

194. On September 8, 2019, GAL Brantley texted an ultimatum to Mr. D. Deaton as a court appointed official, "U need to make the appt work for tomorrow. It's not optional and this will not be prolonged. If it's delayed, I'll have to

file something." [sic] to demand Mr. D. Deaton take Plaintiffs L.W.D. and R.E.D. for a mental health evaluation with Ms. D. Malone.

195. GAL Brantley selected Ms. D. Malone for the mental health evaluation, demanded Mr. D. Deaton make the appointment work, and ultimately GAL Brantley physically took control of and transported Plaintiffs L.W.D. and R.E.D. to the appointment in her vehicle.

196. On October 28, 2019, GAL Brantley acted under the color of the law to represent Ms. Leanne Deaton while simultaneously representing L.W.D. and R.E.D. without the possibility of obtaining a waiver from the minor children L.W.D. and R.E.D.

197. On October 28, 2019 at 9:09 AM, GAL Brantley texted a threatening demand on Ms. L. Deaton's behalf: "Call and let the schools know that she [Ms. L. Deaton] can pick them up after school is out. Not a request." [sic] This was during Mr. D. Deaton's ordered custodial time.

198. Attorney Crittenden was previously ordered to be jailed for directing the violation of a court order in the Jefferson County Circuit Court Domestic Relations Division under a previous presiding judge, and any attorney knows or should know that directing the violation of a court order is not allowed by law.

**J. Attorney Fann Appoints Her Friend, Ms. C. Taylor, with an Unlimited Budget and Recommends that a non-Attorney be Allowed to Enter Judge's**

**Orders; Judge Chappell Orders the Recommendation with Devastating Effects on G.M.W.**

199.  On September 10, 2019, Attorney Fann was appointed as a daily master by Judge Chappell in Mr. S. Wyatt and Ms. T. Peake's custodial case.

200.  Attorney Fann provided a report to Judge Chappell that her friend, Ms. C. Taylor, be allowed to make recommendations that become court orders following (10) days.

201.  At no point was Ms. T. Peake informed of the cost nor necessity of Ms. C. Taylor's involvement.

202.  Ms. C. Taylor was granted the ability to act as a defacto judge with very few parameters around her legally binding decisions.

203.  Upon information and belief, Attorney Fann and Ms. C. Taylor have a pre-existing relationship outside of their professional capacities.

204.  Through this unethical plot, Attorney Fann accrued even more professional fees for her friend, Ms. C. Taylor.

205.  Judge Chappell then used her authority from the bench to force Mr. S. Wyatt and Ms. T. Peake to pay approximately $15,000 for the unethical and unconstitutional work performed by Ms. C. Taylor in just a few months without requiring Ms. C. Taylor to produce her invoices or G.M.W.'s file at any time despite multiple requests.

206. Ms. T. Peake was not allowed an evidentiary hearing, as is required by law, to question the details of Ms. C. Taylor's invoices or even to receive all of her invoices.

**K.     GAL Wess Accepts Bribe from Ms. C. Wyatt and Mr. G. Wyatt.**

207. On October 28, 2019, Judge Chappell appointed GAL Wess as guardian ad litem for G.M.W.

208. Ms. C. Wyatt and Mr. G. Wyatt bribed GAL Wess to serve as their de facto attorney against the interest of G.M.W. with a direct payment.

209.  GAL Wess' conduct was directly in contrast to the wishes of the parents as outlined in the Final Judgment of Divorce.

210. To date, GAL Wess has been ordered to receive approximately $80,000 in fees that he has never proven.

211. At the Peake v. Wyatt post-divorce custody trial, GAL Wess colluded with Defendants C. Wyatt and G. Wyatt including to introduce last minute exhibits at their request.

212. GAL Wess asked Judge Chappell to grant the relief Ms. C. Wyatt and Mr. G. Wyatt were seeking, even though there was no claim from Ms. C. Wyatt and Mr. G. Wyatt before Judge Chappell.

213. While Judge Chappell acknowledged there was no claim from Ms. C. Wyatt or G. Wyatt pending before her court, Judge Chappell granted the relief GAL Wess sought on their behalf.

**L.     GAL Brantley Objects to Herself.**

214.    On January 28, 2020, Mr. D. Deaton, Ms. L. Deaton, and GAL Brantley reached an agreement regarding plans for J.K.D's court ordered therapy.

215.    GAL Brantley directed violations of the January 28, 2020 agreement of all parties and filed an objection to the agreement on March 4, 2020.

216.    GAL Brantley objected to J.K.D. receiving the medical care her parents agreed to and to the same agreement GAL Brantley also signed.

217.    GAL Brantley's objection to the agreement of the parties further blatantly requested, "this Honorable Court to include in its Order that the GAL fee's are to be paid within thirty (30) days of the filing" [sic].

218.    Mr. D. Deaton followed the agreement as written, but Ms. L. Deaton refused while receiving direction from GAL Brantley.

219.    Because of the work of The Enterprise, J.K.D. did not receive the therapy she needed against the stated wishes of both parents.

220.    Even when Mr. D. Deaton and Ms. L. Deaton agreed in writing, GAL Brantley opposed their agreement which caused a 16-month delay in receiving an order from the court.

221.    Mr. D. Deaton and Ms. L. Deaton agree this delay caused great mental and emotional harm to J.K.D., L.W.D., and R.E.D.

222.    GAL Brantley later acknowledged on the record that the continued litigation had harmed J.K.D., L.W.D., and R.E.D.

223. A final order, on the parties' agreement, was not issued until May 12, 2021, as GAL Brantley continued filing motions in contradiction to the agreement of the parties.

224. GAL Brantley continued profiting off Mr. D. Deaton and Ms. L. Deaton for approximately (2) additional years.

225. Mr. D. Deaton is not aware of the alleged work GAL Brantley performed.

**M.** **GAL Brantley Substantially Profits from Scheme and Starts New Law Firm.**

226. GAL Brantley substantially profited financially by billing for the entire (2) year period due to the delay caused by her own actions and objections to an agreement of the parents that she also signed.

227. GAL Brantley was able to utilize this financial scheme to fund her own legal practice, Hardy Law Firm, on July 30, 2021.

228. Mr. D. Deaton has repeatedly and consistently requested a detailed invoice of GAL Brantley's fees and an evidentiary hearing to determine the appropriateness of these fees to no avail.

229. As is shown repeatedly throughout this complaint, GAL Brantley, and the other co-defendants who financially benefited from their actions, have yet to be required to show full details of their billings nor sit for an evidentiary hearing regarding their fees *as is required by law*, while receiving top cover from Judge Chappell, Judge Stephens, and Judge May.

230.   GAL Brantley has a pattern and practice of violating the law.

231.   When GAL Brantley was running for a judicial seat in Jefferson County, GAL Brantley brazenly paid herself $2,739.62.

232.   Instead of following Section 17-5-7 "Use of excess moneys received; solicitations, etc., of contributions", GAL Brantley filed the $2,739.62 fee to herself as an expenditure on "Form 5: Expenditures" in defiance of acceptable uses.

**N.    Mr. D. Deaton Asks to Remove GAL Brantley.**

233.   On January 23, 2020, Mr. D. Deaton filed a motion to remove the GAL Brantley as GAL after learning of her misconduct through his counsel.

234.   On January 24, 2020, as a retaliatory motion and attempt to further muddy the waters, GAL Brantley filed legal action against G.M.W. and Ms. T. Peake seeking an order of no contact against Mr. D. Deaton's stepson (a minor child) and his wife, even though neither parent alleged there was an issue giving rise to a no contact order with Ms. T. Peake or with G.M.W.

**O.    GAL Brantley Selects Medical Provider to Evaluate the Deaton Minor Children.**

235.   GAL Brantley selected a medical provider, Ms. D. Malone, and directed Ms. L. Deaton and Mr. D. Deaton to take the children only to her friend, Ms. D. Malone.

236. On September 23, 2019, GAL Brantley physically took control of Plaintiffs L.W.D. and R.E.D. taking them into GAL Brantley's vehicle and physically bringing them to her friend and medical provider, Ms. D. Malone.

237. On September 23, 2019, GAL Brantley took possession of and physically transported R.E.D. and L.W.D. to the office of Ms. D. Malone.

238. On or about October 4, 2019, Ms. L. Deaton brought Plaintiff J.K.D to Ms. D. Malone on the demand of GAL Brantley.

239. In an unconstitutional grab of parental rights and despite the consistent objections of Mr. D. Deaton, GAL Brantley took it upon herself to direct the minor children's healthcare and has continued to do so even as recently as one month prior to the filing of this Complaint.

240. GAL Brantley subjected the minor children to a medical disorder examination conducted by Ms. D. Malone directing that "it would not be delayed".

241. Ms. D. Malone publicly produced healthcare reports on J.K.D., L.W.D., and Plaintiff R.E.D. in the courthouse lobby.

242. These reports included what Ms. D. Malone alleged the minor children said in their HIPAA-protected therapy sessions.

243. Ms. D. Malone, GAL Brantley, Attorney Drennan, and Attorney Duncan then spread this HIPAA-protected health information to multiple attorneys in direct violation of the privacy rights of the minor children.

**P.    Attorney Drennan writes-in Attorney Davidson to a handwritten agreement as Parenting Coordinator.**

244.   Attorney Drennan writes-in parenting coordinator Attorney Davidson to a handwritten negotiated agreement on January 28, 2020.

245.   Attorney Drennan and GAL Brantley demanded that there would not be an agreement of the parties unless Attorney Davidson was added by name as a parenting coordinator.

**Q.    J.K.D., L.W.D., and R.E.D. are placed on Medicaid and Financial Assistance Against I.R.S. requirements.**

246.   Upon information and belief, Southern Maryland Dredging, Mr. C. Wilson, Ms. R. Wilson, and Ms. Goldman paid or caused to pay over a million dollars in bribes and fees that came from state and federal awards to their company, South Maryland Dredging.

247.   These bribes include hundreds of thousands of dollars just in the last year.

248.   On or around February 2020, Ms. L. Deaton placed the J.K.D., L.W.D., and R.E.D. on Medicaid in Maryland and has refused to provide necessary information to Mr. D. Deaton to discuss the applicable health insurance options for the children or to exercise any other option that does not place the entire burden on the taxpayers' shoulders, while her family spends millions in legal fees and bribes on her behalf.

249.   Ms. L. Deaton <u>waived</u> the children's health insurance offered by her work, while refusing Mr. D. Deaton access to the information, to leverage taxpayer dollars for the children to be placed on Medicaid while this fraud continues today.

250.   Upon information and belief, Southern Maryland Dredging, Mr. C. Wilson, Ms. R. Wilson, and Ms. Goldman failed to disclose substantial gifts on their respective taxes.

**R.    Ms. L. Deaton Seeks Financial Assistance at Multiple Private Schools in Maryland.**

251.   On or around the summer of the 2020, Ms. L. Deaton applied for J.K.D., L.W.D., and R.E.D. to attend multiple private schools in Maryland seeking financial assistance and failing to disclose Mr. D. Deaton as a legal guardian.

252.   Ms. L. Deaton did not discuss or disclose any of the applications with Mr. D. Deaton before applying on the minor children's behalf.

253.   After learning the children were to be enrolled in Annapolis Area Christian School, Mr. D. Deaton contacted the school and, at first, was not able to get any information as he was not listed as a parent or guardian.

254.   Ms. L. Deaton did not take the children to Annapolis Area Christian School after the false disclosures were uncovered.

255.   In the summer of 2021, Ms. L. Deaton stated that J.K.D. was enrolled at St. Anne's School.

256.  Ms. L. Deaton acknowledged the minor children's schedule at different schools far apart would be a substantially changed.

257.  Mr. D. Deaton filed an urgent motion with Judge Stephens regarding the changes in the children's transportation schedule, which was never heard.

258.  Later, Ms. L. Deaton acknowledged the changes in the children's schedule and to their flight schedules caused substantial hardship on the children.

259.  J.K.D. receives financial assistance for her private education of approximately $12,100 per year in financial aid plus an additional scholarship award of $5,000.

260.  Ms. L. Deaton, acting on advice of Attorney Drennan, provided redacted copies of financial school records to Mr. D. Deaton stating he wasn't entitled to the J.K.D.'s financial records.

261.  GAL Brantley and Attorney Davidson insisted the educational records were not redacted in writing and made directives for Ms. L. Deaton's benefit without investigating the issues affecting the minor children.

262.  It was later revealed, and Ms. L. Deaton admitted that the documents were in fact redacted.

263.  Southern Maryland Dredging, Mr. C. Wilson, Ms. R. Wilson, and Ms. Goldman leveraged a family friend and staff member at St. Anne's School, Ms. Christiana Harris, to pursue this financial assistance and application.

264. At all times relevant, Southern Maryland Dredging and Mr. C. Wilson did not disclose these substantial gifts on their taxes, so the taxpayers would continue carrying the burden of their bad acts.

**S.    Attorney Gregory Absconds with G.M.W.**

265. On June 21, 2020, at approximately 6:30 PM, Attorney Gregory absconded with G.M.W., taking him into her care, unsupervised.

266. Attorney Gregory drove and spoke to G.M.W. alone in her car and then refused to comply with any subpoenas for babysitting records while receiving top cover from Judge Chappell.

**T.    Ms. C. Wyatt Threatens Process Server with Gun Violence.**

267. On July 21, 2020, in an attempt to deprive Ms. T. Peake access to evidence for trial, Ms. C. Wyatt threatened violence with a firearm on a process server who appeared at her home with a subpoena.

268. The process server, Ms. Teresa Ann Smith, submitted an affidavit on July 22, 2020, describing the violent threat.

**U.    Defendants Attorney Yarbrough, Attorney Gregory and Crittenden Partners File an Emergency Motion to Prevent G.M.W. from starting kindergarten at Highlands School, where both Parents Toured and Paid an Application Fee to Hold G.M.W.'s Spot.**

269. In a stated effort to stop Mr. S. Wyatt's obligation and agreement to pay $20,000 per year in school tuition, Crittenden Partners charged hundreds of

thousands of dollars to Mr. S. Wyatt to further the litigation at G.M.W.'s expense.

270. Attorney Yarbrough and Attorney Gregory went so far as to ask Judge Chappell not to consider G.M.W.'s best interest in determining his school.

271. Judge Chappell granted the relief Attorney Yarbrough and Attorney Gregory requested and did not consider G.M.W.'s best interest against well settled law.

272. Mr. S. Wyatt knew that Highlands School was the best school for G.M.W. and has voluntarily agreed to send G.M.W. to Highlands School after many years of unnecessary litigation that continues today.

273. Judge Chappell selected G.M.W.'s school as Homewood City Schools and insisted he could go nowhere else except by written agreement.

274. Judge Chappell further forced Ms. T. Peake to pay for half of G.M.W.'s private school tuition against the agreement of the parties in the Final Judgement of Divorce as punishment even after Mr. S. Wyatt agreed to dismiss his alleged contempt claims regarding G.M.W.'s school with prejudice.

## V.   GAL Wess Goes to Georgia.

275. Upon information and belief and on or around early 2020, GAL Wess travelled to the state of Georgia without leave of court or an order from Judge Chappell.

276. In his visit to Georgia, GAL Wess met with Mr. S. Wyatt's girlfriend, who was working in adult entertainment.

277. GAL Wess inspects her out-of-state home.

278. The GAL in Georgia, who at all times relevant is also a Georgia State Representative, expressed concerns with GAL Wess' statements and testified before Judge Chappell.

279. Judge Chappell did not intervene to supervise GAL Wess or correct this behavior.

280. At all times relevant, GAL Wess is a Judge in municipal court in the City of Midfield, Alabama and knew, or should have known, how inappropriate these actions were.

**W.    GAL Brantley Goes to Maryland.**

281. On or around sometime between September - December 2019, Ms. L. Deaton, Mr. C. Wilson, Ms. R. Wilson, Ms. Goldman, and Southern Maryland Dredging bribed GAL Brantley with an all-expenses paid visit to the state of Maryland and entertained her for multiple days in an effort to further the ongoing conspiracy.

282. On May 5, 2023, Ms. L. Deaton provided sworn testimony that GAL Brantley asked her to pay for GAL Brantley's trip to Maryland.

283. Ms. L Deaton did pay for GAL Brantley's trip to Maryland.

284. GAL Brantley accepted this bribe and never reported it to the tribunal.

285.  GAL Brantley continued to serve as GAL after admitting that she directed violations of a Court Order allowing "special arrangements" requested by Ms. L. Deaton's family during and following her all-expenses paid trip to Maryland.

286.  Upon information and belief, money obtained from state and federal contracts awarded to Southern Maryland Dredging was used to entertain and further bribe GAL Brantley while she was in Maryland.

## X.    Attorney Drennan and Attorney Duncan hired a Private Investigator to Threaten G.M.W. Inside of his Home.

287.  Attorney Drennan and Attorney Duncan hired a private investigator to obtain video of minor child G.M.W. through a window and inside his custodial home.

288.  Attorney Drennan and Attorney Duncan directed a private investigator to obtain video of G.M.W. through a window and to spy on his activities inside of his home.

289.  Rather than use this video for any lawful purpose, Attorney Drennan and Attorney Duncan have sought to use this purported video as the source of threats and harassment to all Plaintiffs.

290.  Despite multiple requests and attempts by attorneys, Attorney Drennan and Attorney Duncan have refused to produce the video, while admitting they have it.

**Y.      Attorney Drennan Falsely Represents that Mr. D. Deaton Accused Ms. L. Deaton of Sending a Bomb to the Minor Children.**

291. After Attorney Drennan and Attorney Duncan refused to produce the video of G.M.W. inside of his home, the Plaintiffs received packages in the mail with no return address sent to the minor children.

292. Mr. D. Deaton inquired with Ms. L. Deaton as to what the packages contained.

293. During the same time, Attorney Drennan, Attorney Duncan, and GAL Brantley sought to cover up the minor children's concerning testimony and plea for help by sealing the certified transcript of the children's testimony and making false statements to state child protection agencies and to multiple tribunals.

294. To distract from these crimes, Attorney Drennan represented the following to a tribunal on August 30, 2019: "She [Ms. L. Deaton] sent modeling clay [to the minor children] and Mr. Deaton accused her of trying to send a bomb [to the minor children]."

295. At all times relevant, Attorney Drennan knew this statement was false and used this shocking language of an alleged chemical or nuclear threat as a ploy to distract from the video she obtained of G.M.W. inside of his home that Attorney Drennan refused to turn over to G.M.W.'s parents.

296. Attorney Drennan was a participant in what caused this concern and leveraged false statements to the tribunal to distract from her own bad acts and to continue this case to balloon her alleged profits.

**Z.  Mr. D. Kellner Accepted a Bribe to Travel to the State of Alabama Without the Minor Children's Records to Participate in a Cover Up of the Children's Testimony.**

297. Upon information and belief, Mr. D. Kellner accepted money from Southern Maryland Dredging, Mr. C. Wilson, Ms. R. Wilson, and Ms. Goldman to travel to Alabama without the minor children's records to testify.

298. Attorney Drennan and Attorney Duncan relied on the testimony by Mr. D. Kellner to allege that Mr. D. Deaton made false claims expressing concern for his children.

299. Attorney Drennan, Attorney Duncan, and GAL Brantley litigated to seal the minor children's testimony and prevent child protection agencies from reading the plain text of the certified transcript.

**AA.  GAL and PC Collusion.**

300. GAL Brantley, GAL Wess, and Ms. C. Taylor released private information regarding the Plaintiff children without the consent of Ms. T. Peake or Mr. D. Deaton.

301. After unethically trading their clients' confidential information, GAL Wess and GAL Brantley continued to file unnecessary, knowingly false, and

unconstitutional motions to increase the size of their claimed legal fees while refusing to prove their fees.

302. Ms. C. Taylor and GAL Wess colluded to file an emergency motion on December 20, 2019.

303. Ms. C. Taylor reviewed a draft of GAL Wess' emergency motion as a non-attorney on December 20, 2019 and included reference to it in her invoices.

304. When Ms. C. Taylor discovered this was an issue, she refused to turn over G.M.W.'s file or all of her invoices to cover up more bad acts.

305. GAL Brantley and GAL Wess conspired on January 24, 2020, by filing motions in each respective case to receive predetermined outcomes and further line their pockets with the money from the Plaintiffs as ordered by Judge Chappell and Judge Stephens without ever requiring an evidentiary hearing on alleged GAL fees in either case.

**BB.   Ms. C. Taylor and GAL Wess directed G.M.W. to See Dr. Mashburn: The Therapist They Selected for the Minor Child.**

306. Ms. C. Taylor directed Ms. T. Peake and Mr. S. Wyatt take G.M.W. to see Ms. C. Taylor's friend, Dr. Mashburn, for mental health treatment.

307. GAL Wess also recommended Dr. Mashburn and filed multiple motions before Judge Chappell to force G.M.W. to see Dr. Mashburn.

308. Ms. C. Taylor and Dr. Mashburn exchanged medical referrals for minor children in multiple cases, including when Ms. C. Taylor directed referrals under color of state law, to increase their billings.

309. In email correspondence on July 30, 2020, Mr. S. Wyatt confirmed that he was directed by Dr. Mashburn, Ms. C. Taylor, and GAL Wess to submit G.M.W. to non-consensual medical treatment.

310. In the same correspondence, Mr. S. Wyatt further confirms that Ms. C. Taylor and Dr. Mashburn conspired to, and did, direct the restriction of G.M.W.'s phone calls with Ms. T. Peake.

**CC.   Ms. C. Taylor, a Non-Attorney, acts as a Judge and Judge Chappell does not Intervene to Supervise her Appointment.**

311. At all times relevant, Ms. C. Taylor received notice and knew that her "formal recommendation" would become a Court Order in (10) days unless Ms. T. Peake or Mr. S. Wyatt objected pursuant to the plain language of Judge Chappell's order.

312. Even if a party did object, Judge Chappell ignored motions to her court for years, so Ms. C. Taylor insisted that her "formal recommendations" must be followed.

313. Ms. C. Taylor directed G.M.W.'s medical care at all times relevant during her court appointment as Parenting Coordinator.

314. Ms. C. Taylor also directed Ms. T. Peake and Mr. S. Wyatt's medical care.

315. Ms. C. Taylor restricted Ms. T. Peake from reaching G.M.W. by phone except on certain dates.

316. Each of these unconstitutional acts also resulted in additional profits for Ms. C. Taylor and the rest of her friends working together as part of this association to defraud families.

317. On October 29, 2019, at 3:57 PM, Ms. C. Taylor directed Ms. T. Peake to file an objection through her lawyer if she disagreed with Ms. C. Taylor's recommendations regarding the care of minor child, G.M.W., to further legal and medical fees for her and her co-conspirators.

318. On December 19, 2019, Ms. C. Taylor states that she, serving as a court appointed Parenting Coordinator, does not think a call with the parents, Ms. T. Peake and Mr. S. Wyatt, will be "productive." Instead, Ms. C. Taylor encourages Attorney Yarbrough, GAL Wess, and Ms. T. Peake's attorneys to speak to her directly and try to address certain issues. Ms. C. Taylor further stated that she spoke to Dr. Mashburn. Defendant Taylor stated she is ready to make a "formal recommendation" affecting G.M.W. and further stated

that Dr. Mashburn, who had a duty to maintain privilege to G.M.W., agreed with her formal recommendation.

319.  On December 20, 2019, and continuing onto G.M.W.'s 5th birthday, Ms. C. Taylor, a non-attorney, colluded together with GAL Wess on an emergency motion.

320.  Judge Chappell placed restrictions on G.M.W. at Ms. C. Taylor and GAL Wess' request that stayed in place for years and directly prevented G.M.W. access to his mother for his Christmas visitation with her and on the morning of his 5th birthday.

321.  Ms. C. Taylor further stated she sent her recommendations directly to Judge Chappell, which if true, were sent to the Judge Chappell *ex parte* as there is no record with the tribunal of a filing by Ms. C. Taylor at that time.

322.  Ms. C. Taylor is not an attorney or an elected official.

323.  On December 22, 2019, Attorney Gregory referred to Ms. C. Taylor's recommendations as judge's orders and directed Mr. S. Wyatt to follow Ms. C. Taylor's "orders" while increasing profits for herself and causing direct harm to G.M.W.

324.  There was never a period in time in which Ms. T. Peake was ordered to receive any type of supervised visitation from any court for any reason.

325.  There was never any evidence presented at any time before any court that would justify Ms. T. Peake receiving supervised visitation.

326.  In Defendant Gregory's December 22, 2019, email at 9:15 PM during Plaintiff Peake's parental visitation with G.M.W. for the Christmas holiday and on the eve of G.M.W.'s 5th birthday, Defendant Gregory insists Ms. T. Peake has supervised visitation, referring to Ms. C. Taylor's recommendations as judicial orders of the court.

327.  Judge Chappell did not set a hearing and no testimony was before her court when G.M.W. was withheld from his mother over his Christmas visitation in 2019 and the morning of his 5th birthday.

328.  Judge Chappell entered an order, against well settled substantive and procedural due process laws, directing the care of G.M.W. based on these *ex parte* communications and filings before her court that offered no evidence.

329.  On or around January 2020, Plaintiff Peake objected to and raised substantial issues with Ms. C. Taylor's actions.

330.  Ms. C. Taylor's conduct caused, or participated in causing, G.M.W. to miss his custodial birthday and Christmas visitation with his mother, Ms. T. Peake.

331.  Ms. C. Taylor responded by raising her fees and demanded a new contract that included restricting the parent from gathering recorded evidence of Ms. C. Taylor's bad acts.

332. Even after this was brought to Judge Chappell's attention through multiple filings and representation before her court, Judge Chappell did not set a hearing to address the allegations that her order was based on.

333. Judge Chappell never altered her December 23, 2019 order.

334. Ms. C. Taylor stated in writing that if Ms. T. Peake did not consent to her new agreement, on behalf of her minor child G.M.W., that Ms. C. Taylor would no longer coordinate visitation for Ms. T. Peake.

335. Ms. C. Taylor extorted Ms. T. Peake to sign a new agreement, increasing Ms. C. Taylor's fees, to ensure Ms. T. Peake would still be able to see and visit with her own child.

336. Ms. C. Taylor stated she would coordinate visitation for Mr. S. Wyatt, because he agreed to her increase fee scheme.

337. Ms. C. Taylor made clear that unless Ms. T. Peake agreed to the same increased fees, her visitation would be reduced or eliminated altogether.

338. Ms. C. Taylor's financial scheme was a blatant and successful effort to extort Ms. T. Peake for access to her child, G.M.W.

339. On December 22, 2020, and again after, Ms. T. Peake raised concerns regarding the nature of the personal relationship between Mr. S. Wyatt and Ms. C. Taylor.

340. Ms. C. Taylor was directing the care of G.M.W. even after Mr. S. Wyatt came to her personal residence.

341. Upon information and belief, issues have been raised by multiple litigants regarding Ms. C. Taylor's pattern and practice of being personally involved with a parent, while simultaneously working as a court appointee on behalf of the father's minor children without disclosing the nature of her personal relationships.

342. Ms. C. Taylor refused at all times relevant, including as of the time of this filing, to provide Ms. T. Peake with access to her child's files or detailed invoices.

343. As part of the ongoing conspiracy, Ms. C. Taylor continued litigating before Judge Chappell that she was owed legal fees and additional "professional" fees for her services from Ms. T. Peake.

344. Judge Chappell set a hearing at Ms. C. Taylor's request to assess additional fees on Ms. T. Peake.

345. Ms. C. Taylor refused to testify under oath at the same hearing she requested and further intentionally avoided service by a process server for the hearing.

346. Ms. C. Taylor was paid as a fact witness by Mr. S. Wyatt to testify in Judge Chappell's court.

347. Ms. T. Peake objected and moved to strike Ms. C. Taylor's testimony after she testified that she was paid $1500 to testify that day against the plain language of the criminal code.

348. Ms. C. Taylor did not bring any of G.M.W.'s records to Court or provide them to his parents at any time.

**DD. Attorney Davidson and GAL Brantley Demand to Speak to Mr. D. Deaton's Work Supervisor for Him to See His Children Despite No Requirement for the Same in Court Order; Following These Events, Mr. D. Deaton was Let Go from His Job During the Pandemic.**

349. On or around December 21, 2020, Attorney Davidson and GAL Brantley worked together to prevent Mr. D. Deaton from seeing his children during a work trip close to the children's home in Maryland.

350. After speaking to GAL Brantley, Attorney Davidson demanded that Mr. D. Deaton provide travel and work information before he would be allowed to see his children.

351. Mr. D. Deaton was prevented from seeing his children, even though he was entitled this time in the court order and proper notice was provided.

352. Mr. D. Deaton expressed concern with being prevented from seeing his children and offered to provide an affidavit.

353. Attorney Davidson replied on behalf of Ms. L. Deaton in an email on December 21, 2020, "*Drew, as stated in an individual email. Leanne did not ask for the verification of your employer. I want to make sure blame is assessed in the correct place. I am the ONLY person who requested the same. The issue was brought to my attention by both of you via email and*

*text. I have not had a single phone call with either of you since the emails hit my in box. I have only emailed with each of you and spoken to Slate (Dad's attorney) and updated the GAL as you all have seen in the emails since this deals directly her clients. I determine what is needed for decisions/ recommendations to be made. Neither of you make those decisions for me.*"

354. On January 13, 2021, Ms. L. Deaton requested that Attorney Davidson provided verification that satisfied Attorney Davidson, so Mr. D. Deaton may be allowed to his see children.

355. On or around April 13, 2021, Attorney Davidson and GAL Brantley worked together *again* to prevent Mr. D. Deaton from seeing his children during a work trip close to the children's home in Maryland.

356. After speaking to GAL Brantley, Attorney Davidson demanded that Mr. D. Deaton provide his supervisor's contact information at his job before he would be allowed to see his children.

357. Mr. D. Deaton was never permitted access to his children overnight, even though the court order allowed it.

358. Following the attempts by Attorney Davidson and GAL Brantley to harass Mr. D. Deaton's employer <u>outside of a</u> court sanctioned subpoena process, Mr. D. Deaton was fired from his job during the pandemic causing emotional distress and financial damage.

**EE.  Maryland Court Intervenes to Protect Deaton Children.**

359. On September 25, 2021, Mr. D. Deaton learned of an altercation between Ms. L. Deaton and J.K.D. on the property of Mr. C. Wilson that occurred on September 23, 2021.

360. Mr. D. Deaton asked Ms. L. Deaton about what happened and followed up on September 29, 2021, October 6, 2021, and again on October 8, 2021.

361. Despite a text message from Ms. L. Deaton to J.K.D. apologizing for the altercation, Ms. L. Deaton never addressed the altercation and said, "her neck hurts and I suspect she's tired."

362. Ms. L. Deaton would not explain or acknowledge the altercation despite the stated apology to her oldest child.

363. On September 25, 2021, Mr. D. Deaton asked J.K.D.'s then-counselor Ms. McNew for any recommendations considering what was happening inside Ms. L. Deaton's house.

364. Attorney Drennan made multiple statements on the records about how entangled she was in Ms. L. Deaton's life and her directives to Mr. D. Deaton through Ms. L. Deaton on and around September 17, 2021.

365. Attorney Drennan stated on the record that: "I [Attorney Drennan] read every email that my client [Ms. L. Deaton] sends Mr. Deaton now..."

366. And, Attorney Drennan further stated: "He was kept informed because I read the emails myself. He was kept informed. There was no questions, but I will tell you, I don't know if Mr. Deaton is harassing my client or if he just has a

processing problem because my client will give him information, and three days later, he will ask the same questions and say you never gave me this information. I have really never seen anything like it." [sic]

367. On October 9, 2021, Mr. D. Deaton heard an altercation between Defendant L. Deaton and J.K.D. inside Defendant L. Deaton's home on the property of Mr. C. Wilson while Mr. D. Deaton was on the phone with Plaintiff R.E.D. J.K.D. could be heard sobbing and whimpering in the background.

368. Ms. L. Deaton could be heard telling R.E.D. to get off the phone.

369. On or around October 24, 2021, L.W.D. expressed concern about an incident that occurred in Ms. Deaton's home saying, "Whenever mom and [J.K.D.] get in a fight I'm never allowed to go upstairs when it's happening. Well, I am allowed to go upstairs but I purposely don't go upstairs because the fights are pretty bad." "That keeps going on to a while until J.K.D starts crying and tells [Ms. L. Deaton] to go away." "Yeah… one time she slammed a door in the bathroom and a mirror broke. Fights between mom and [J.K.D.] are pretty bad." "One time mommy got mad at me and [J.K.D.] and made us rake leaves for an hour." [what are they usually over] "I don't know" [What happened to cause you to have to rake leaves] "Mom just got upset because…mom was just having a bad day that day because she did something that she shouldn't have and then got upset about it and accidentally took it out on us."

370. On November 19, 2021, after several communications from J.K.D.'s counselor, Ms. McNew stated, "Unfortunately I have not been able to make a connection with her [J.K.D.] to gain her motivation to work on treatment plan goals. … At home, she can be uncooperative and isolative per her mother." [sic]

371. Considering the history of violence of Ms. L. Deaton, Mr. D. Deaton filed an emergency petition in Maryland, which was granted.

**FF.   Ms. Deaton's Retaliatory Petition for Protection from Abuse Denied in Maryland; GAL Brantley Intervenes in a Department of Social Services Investigation in Maryland.**

372.  On November 23, 2021, Ms. L. Deaton filed a frivolous and retaliatory petition for protection in the state of Maryland which was denied on the same day by Judge Donna M. Schaeffer, Circuit Court for Anne Arundel County, Maryland because Ms. L. Deaton could not meet required burden of proof.

373. Following the Maryland court's denial of Ms. L. Deaton's petition, GAL Brantley contacted the Department of Social Services (DSS) in Maryland and interjected herself into an out-of-state child protection investigation and is directly cited in the report that was presented to the tribunal in Maryland.

374.  Prior to and following being re-appointed to the case in Alabama, GAL Brantley was working to obstruct the child protection state investigation in Maryland.

375.  Ms. L. Deaton knows that GAL Brantley, Attorney Drennan, and Attorney Duncan will inject themselves into state investigations, including safety investigations, to increase profits.

376.  On December 15, 2021, Ms. L. Deaton sent a text message to Attorney Drennan and GAL Brantley stating she received a call from a Maryland Department of Social Services worker and provided the name of the worker.

377.  Ms. L. Deaton further states that the minor children met with the Alabama Department of Human Resources worker, who "has not sent over her notes". Ms. L. Deaton asked GAL Brantley and Attorney Drennan if an Alabama Department of Human Resources supervisor can help.

378.  GAL Brantley previously told Ms. L. Deaton and Mr. D. Deaton that she was close friends with the legal supervisor for the Alabama Department of Human Resources.

379.  On September 17, 2021, Attorney Drennan admitted on the record that she reads every email Ms. L. Deaton sends to Mr. D. Deaton.

380.  On December 15, 2021, GAL Brantley reported to Ms. L. Deaton, but not the tribunal, that she spoke to the Alabama Department of Human Resources, received an update from them, and she is certain that the

Alabama Department of Human Resources will get the update to the Department of Social Services in Maryland.

381. On December 15, 2021, GAL Brantley further stated that the Alabama Department of Human Resources understands the importance of their report.

382. The Department of Social Services state agent met with or spoke to Ms. R. Wilson, Ms. L. Deaton, and GAL Brantley.

383. The Department of Social Services agent in Maryland never met with the children or with Mr. D. Deaton.

384. Instead, GAL Brantley coordinated and instructed a Alabama Department of Human Resources representative to visit with the children one time and further made false statements to the Alabama Department of Human Resources state agent to influence the outcome of the investigation.

385. The Department of Human Resources did not visit with or speak to Mr. D. Deaton again following the one visit and GAL Brantley's directives.

386. GAL Brantley was mentioned throughout the Department of Social Services report in the state of Maryland.

387. The report only contained what Ms. L. Deaton, Ms. R. Wilson, and GAL Brantley reported to the Maryland Department of Social Services.

388. On December 4, 2021, GAL Brantley states to Ms. L. Deaton that the Alabama Department of Human Resources are to get back to her regarding seeing J.K.D., L.W.D., and R.E.D.

389. Both Mr. D. Deaton and Ms. L. Deaton understood that GAL Brantley had interjected herself in the Maryland Department of Social Services investigation and the Alabama Department of Human Resources investigation.

390. The parents also further understood that GAL Brantley was shaping the narrative and timeline of events, including what was reported to the tribunal in Maryland.

391. On December 16, 2021, after the report was brought to Judge Shaem Spencer, the District Court of Maryland for Anne Arundel County, Mr. D. Deaton reviewed the Maryland Department of Social Services report in which he was not involved or interviewed.

392. Mr. D. Deaton dismissed his claim before Judge Shaem Spencer and the District Court of Maryland for Anne Arundel County after learning of the conspiracy with GAL Brantley and sought to obtain more discovery on the issue in Alabama.

393. Mr. D. Deaton immediately filed notice of this issue and conflict with GAL Brantley before Judge Stephens.

394. A hearing was never set regarding these issues directly affecting the children's safety.

**GG. Judge Stephens Refuses to Allow to Maryland Court Emergency Jurisdiction.**

395.  After receiving an Emergency Temporary Restraining Order from the State of Maryland against Ms. L. Deaton, Mr. D. Deaton filed a Motion to Stay on November 24, 2021 at 11:47 AM before Judge Stephens in Alabama.

396.  Before the Maryland court, who were not participants in The Enterprise, the judges held hearings, heard testimony, and made rulings in the best interest of the children.

397.  Judge Stephens held a conference call with the Maryland Court regarding jurisdiction.

398.  Mr. D. Deaton was not given notice of the date or time of the call with the Maryland court, and it is unknown what was communicated between Judge Stephens and the Maryland court.

399.  Maryland state court exercised emergency jurisdiction to protect the minor children.

400.  Judge Stephens never granted a stay and continued to exercise competing jurisdiction with the State of Maryland.

401.  Judge Stephens refused at all times relevant to stay the case or cease her court appointed guardian ad litem, GAL Brantley, from directly interfering with the state of Maryland's safety investigation.

402.  On November 30, 2021, Judge Stephens entered an order stating in part: "All issues concerning school shall be facilitated by the guardian ad litem." and "That the Father shall not enroll the children in school in Alabama

pending further orders of the court." This order was entered on November 30, 2021 at 11:22 AM CT as electronically stamped by the Alafile system.

403.   Judge Stephens entered this order denying Mr. D. Deaton the right to enroll his children in school, when Maryland awarded him temporary custody of his children.

404.   Judge Stephens directed prevented Mr. D. Deaton from prosecuting his emergency case in Maryland by interfering with an out-of-state investigation and allowing GAL Brantley to directly interfere in an out-of-state emergency investigation of child abuse.

**HH. GAL Brantley and Attorney Drennan Collude with Judge Stephens to Eliminate J.K.D., L.W.D., and R.E.D.'s Christmas visitation with their father and legal guardian without a hearing or any testimony.**

405.   On December 15, 2021, Ms. L. Deaton, GAL Brantley, and Attorney Drennan discuss that if Judge Stephens does not want to suspend the children's visitation with their father, Mr. D. Deaton, that "maybe he can do his visit in MD" via text message.

406.   Attorney Drennan quickly responds with "Good idea".

407.   Out of this communication, GAL Brantley files an emergency motion to eliminate Mr. D. Deaton's Christmas visitation with his children, and Attorney Drennan joins in on this "good idea" in a colluded effort to deprive Mr. D. Deaton of his constitutional rights.

408. Judge Stephens grants these motions without a hearing or any evidence against well-established substantive and procedural due process laws.

409. Ms. Deaton did not allow Mr. D. Deaton to see, visit, or speak frequently with the children in Maryland or in Alabama during December 2021 stating she was simply following Judge Stephens' order.

## II. Ms. C. Coker and Ms. A. Weiss Imprison J.K.D. and Withhold Her Records Despite Safety Concerns and a State Emergency Court Order.

410. On or around November 23, 2021, St. Anne's School would not allow Mr. D. Deaton access to his daughter, J.K.D., and instead held her on campus with a law enforcement officer against an emergency court order.

411. On November 23, 2021 at 11:41 AM ET, Mr. D. Deaton sent an Emergency Temporary Protective Order against abuse to A. Weiss, Head of School for St. Anne's Episcopal School issued by District Court of Maryland for Anne Arundel County on November 22, 2021 stating in part that Leanne Deaton "Shall not contact the protected parties by any means." and Leanne Deaton "shall stay away from: School: Tracey's Elementary School" and "School: St. Anne's School of Annapolis". The protected parties listed were D. Deaton, J.K.D., L.W.D., and R.E.D.

412. On November 23, 2021 at 11:43 AM ET, Ms. A. Weiss, Head of School for St. Anne's School, confirmed receipt of Temporary Protective Order by email stating: "Got it. I will call you when the police arrive."

413. At all times relevant, St. Anne's School never alleged that Mr. D. Deaton created a disturbance.

414. Mr. D. Deaton did not enter the school at any time, but instead called St. Anne's School to let them know he would be picking up J.K.D.

415. Mr. D. Deaton was denied access to the school.

416. St. Anne's School would not allow Mr. D. Deaton to enter the school or pick up his daughter.

417. Ms. A. Weiss and Ms. C. Coker held J.K.D. on school property and refused to release J.K.D. to her father and legal guardian.

418. Even after Mr. D. Deaton produced an emergency court order, Ms. A. Weiss and Ms. C. Coker still refused to allow Mr. D. Deaton to pick up his daughter.

419. At the time Mr. D. Deaton arrived, Ms. L. Deaton was not at the school.

420. St. Anne's School was provided notice that Mr. D. Deaton was picking up J.K.D.

421. Ms. A. Weiss on behalf of St. Anne's School acknowledged that Ms. L. Deaton was not at the school, but still prevented Mr. D. Deaton access to his daughter.

422. Ms. A. Weiss contacted Ms. L. Deaton and held J.K.D. at the school for over an hour until Ms. L. Deaton arrived.

423. Tracey's Elementary School, the public school where L.W.D. and R.E.D. attend, acted on the clear language of the order, but St. Anne's School refused to follow the emergency court order.

424. After multiple attempts by Mr. D. Deaton to get his daughter's educational records, on June 24, 2022, Ms. C. Coker and Ms. A. Weiss blatantly refused to provide Mr. D. Deaton a copy of J.K.D. 's educational records.

425. Mr. D. Deaton and his counsel have attempted to reach any administrator at St. Anne's School on multiple occasions.

426. At all times relevant, St. Anne's School has refused to send records or allow Mr. D. Deaton access to his child, while being paid by Ms. L. Deaton's family- Mr. C. Wilson, Ms. R. Wilson, Ms. Goldman, and Southern Maryland Dredging.

427. On May 5, 2023, Ms. L. Deaton provided sworn testimony that: "He [Mr. D. Deaton] is a legal guardian. He would be entitled to pick her [J.K.D.] up regardless."

428. Despite Mr. D. Deaton being entitled to pick up J.K.D. from her school, Ms. C. Coker and Ms. A. Weiss directly prevented Mr. D. Deaton from picking up his child and instead falsely imprisoned J.K.D. on campus for over an hour against an emergency court order.

429.  Instead of allowing Mr. D. Deaton to pick up J.K.D. from school, St. Anne's School allows a known felon to pick up J.K.D. from school each day without Mr. D. Deaton's consent while concealing J.K.D.'s records.

**JJ. After being Convicted of Crimes and Refusing to Pay the Judgement Ordered, Mr. C. Langrall Transports J.K.D. from St. Anne's School to his Personal Residence While the School Withholds J.K.D.'s Transportation Records.**

430.  On May 5, 2023, Ms. L. Deaton provided sworn testimony that a known felon, Mr. C. Langrall, picks up J.K.D. from St. Anne's Episcopal School each day.

431.  It is undisputed that Mr. D. Deaton did not have knowledge of this transportation or of the pick-up transportation list provided to St. Anne's Episcopal School despite requests for the records as a legal guardian.

432.  Ms. A. Weiss and Ms. C. Coker attempted to cover up this information in their records to prevent Mr. D. Deaton access to a direct safety concern regarding his child.

433.  Ms. A. Weiss and Ms. C. Coker were aware, or should have been aware, of the criminal activity by Mr. C. Langrall against a family in Maryland as it was reported on and published in local news multiple times.

434. St. Anne's School refused Mr. D. Deaton access to these pick up and drop off records against the court order to ensure they continued to receive payments from Mr. C. Langrall and Ms. L. Deaton's family.

435. The undersigned attempted to contact St. Anne's School requesting the records on Mr. D. Deaton's behalf and never received any returned communication.

436. Ms. L. Deaton provided sworn testimony that Mr. D. Deaton should have access to these records, but she continued not to provide them.

437. Both of J.K.D.'s parents agree these actions were inappropriate.

438. St. Anne's School refused a parent and legal custodian from picking up J.K.D. from school, but instead allowed a felon to pick up J.K.D. each day and take J.K.D. to his personal residence to play Dungeons and Dragons.

439. Mr. C. Langrall family continues to pay St. Anne's School after refusing to pay a $40,000 judgement in which he defrauded a Maryland family.

**KK.  JA Brantley, the biological daughter of GAL Brantley and the Official Judicial Assistant of Judge Chappell, directly received pleadings from the confidential Deaton case and pleadings from the Deaton case in Maryland against the Judicial Inquiry Commission's reported recommendations.**

440. On December 8, 2021, JA Brantley directly received pleadings and confidential documents from the Deaton case, in which her mother and co-resident served as the GAL (Brantley).

441. On December 13, 2021, Mr. D. Deaton subpoenaed JA Brantley to learn what information she had receive or knew regarding his minor children and his case.

442. On December 14, 2021, Judge Chappell stated on the record that she received an opinion from the Alabama Judicial Inquiry Commission that stated in part her need to disclose the conflict regarding GAL Brantley and JA Brantley, which had already been occurring without the Plaintiffs' knowledge for at least four months.

443. Judge Chappell also mentioned the reported need to screen JA Brantley from the proceedings in the case.

444. Following this disclosure that Judge Chappell made for the first time on December 14, 2021 and after Judge Chappell failed to screen JA Brantley from the case, three different parties before Judge Chappell asked her to recuse.

445. Judge Chappell refused to recuse violating multiple Canons of Judicial Ethics and against the reported recommendation of the Judicial Inquiry Commission.

446. On December 15, 2021, Attorney Benita Jenkins filed a "Motion to Quash Subpoena" before Judge Stephens on behalf of JA Brantley.

447. JA Brantley alleges that she has "no personal knowledge pertinent to the resolution of the matter pending before this Court".

448. At all times relevant, JA Brantley knew her statements before Judge Stephens' court were false.

449. JA Brantley was working at the Jefferson County Circuit Court Domestic Relations division and felt emboldened to make these false statements to the presiding judge due to her participation in The Enterprise.

450. In the same motion, JA Brantley acknowledges that Mr. D. Deaton "has a right to subpoena and/or cross examine witnesses with knowledge of the pending matter that can provide information to assist in a resolution of said matter, however, said right does not extend to the harassment of family members of Attorney's of Record". [sic]

451. JA Brantley further acknowledges that Mr. D. Deaton has filed several motions to have the GAL Brantley removed from the case.

452. The next day, on December 16, 2021, Judge Stephens granted JA Brantley's "Motion to Quash Subpoena" without notice, a hearing, or any evidence before her court against substantive and procedural due process laws to provide cover to The Enterprise.

453. At the next hearing, GAL Brantley asks Judge Stephens to award her co-resident and daughter, JA Brantley, legal fees from the Mr. D. Deaton in an unlawful dual representation without the possibility of gaining any consent for a dual representation.

454.  Mr. D. Deaton and his counsel raised this issue as another example of GAL Brantley's clear ethical conflict, and Judge Stephens refused to set an evidentiary hearing at any time.

**LL. Dr. Labellarte prescribes medication to J.K.D. against Mr. D. Deaton's and J.K.D.'s objection and J.K.D.'s concerns with his care.**

455.  On January 25, 2022, Dr. Labellarte took J.K.D. as a patient without Mr. D. Deaton's consent as a legal guardian and without a referral from J.K.D.'s doctor as required by the relevant court order.

456.  On February 8, 2022, Dr. Labellarte instructed Mr. D. Deaton that he did not care or want his opinions as a father or to hear his concerns for his child.

457.  Dr. Labellarte then referred J.K.D. to a therapist, Ms. D. Maynard, in which they shared referrals of minor children for financial gain.

458.  J.K.D. was previously put on (4) different medications in 50 days without Mr. D. Deaton's knowledge, and J.K.D. began to harm herself until the medication was disposed of by Ms. L. Deaton at a sheriff's office.

459.  Dr. Labellarte was made aware of this history and put on notice of the issue but advised that he did not care to hear Mr. D. Deaton's concerns.

460.  Dr. Labellarte prescribed medication to J.K.D. against Mr. D. Deaton direct statements that he would not agree.

461. Dr. Labellarte did not notify Mr. D. Deaton that he prescribed drugs, not approved by the FDA that contain a black box warning for use with minors, to a 12-year-old child without Mr. D. Deaton's custodial consent.

462. As of February 6, 2023, Dr. Labellarte continues to state that J.K.D. "is an established patient with the practice. There should be no issue with the patient seeing their caregiver." without Mr. D. Deaton's consent or J.K.D.'s consent for his services.

463. At all times relevant, Dr. Labellarte has not reported his concerns for J.K.D. in the state of Maryland to any appropriate authority that would give rise to these extreme and unusual actions by a medical provider.

464. At the time of this filing, it is unknown and unclear to Mr. D. Deaton what medications were prescribed to J.K.D.

465. On May 5, 2023, Ms. L. Deaton stated one type of prescription drugs was prescribed to J.K.D. in sworn testimony.

466. On May 15, 2023, Ms. L. Deaton reports that a different type of prescription drugs was prescribed to J.K.D. via email.

467. Dr. Labellarte has not provided Mr. D. Deaton with J.K.D.'s records or prescription information despite multiple requests for the same.

**MM. Ms. D. Maynard Diagnoses J.K.D. at age 12 and Then Refuses to Speak to Mr. D. Deaton Regarding His Concerns for His Child.**

468. On or around April 6, 2022, Ms. L. Deaton hired Ms. D. Maynard on behalf of J.K.D. without conferring with Mr. D. Deaton and without a referral from J.K.D.'s primary care doctor.

469. J.K.D. had previously seen her primary care doctor's office for mental/ behavioral healthcare services.

470. Ms. D. Maynard expressed to Ms. L. Deaton and Mr. D. Deaton that she was concerned with what J.K.D. expressed to her in sessions.

471. Ms. D. Maynard was also concerned with what Ms. L. Deaton expressed about J.K.D. refusing to leave her room in Ms. L. Deaton's home.

472. After reviewing Ms. D. Maynard's notes, Mr. D. Deaton asked about the reports that Ms. L. Deaton made to Ms. D. Maynard regarding J.K.D.

473. Ms. L. Deaton refused to disclose her reported concerns to Mr. D. Deaton.

474. Based in part on the concerns Ms. L. Deaton reported, Ms. D. Maynard recommended that J.K.D. see Dr. Labellarte for medication management knowing the J.K.D. had previously seen Dr. Labellarte without Mr. D. Deaton's consent.

475. Ms. D. Maynard acknowledged that J.K.D. has expressed concerns with taking medication from Dr. Labellarte.

476. Mr. D. Deaton also expressed concerns with Dr. Labellarte.

477. Ms. D. Maynard disclosed privileged information from sessions with J.K.D.

478. At all times relevant, Ms. D. Maynard has not reported her concerns for the minor child in the state of Maryland to any appropriate authority.

479. Ms. D. Maynard, without the consent of J.K.D. and Mr. D. Deaton, referred the child to Dr. Labellarte.

480. Dr. Labellarte previously referred J.K.D. to Defendant Maynard to increase both of their profits. Their respective companies received financial gain from these referrals.

481. Mr. D. Deaton is concerned for his minor children, J.K.D., L.W.D., and R.E.D., and attempted to set parenting sessions with Ms. T. Miller, Ms. D. Maynard, and Ms. L. Deaton.

482. After these concerning diagnoses were sent via email from Ms. T. Miller and Ms. D. Maynard, a parenting session was never scheduled despite Mr. D. Deaton's multiple requests.

483. On March 20, 2023, Ms. D. Maynard stated J.K.D. had diagnosis.

484. On March 21, 2023, Mr. D. Deaton asked Ms. L. Deaton if she canceled Plaintiff J.K.D's appointment on March 23, 2023 with Ms. D. Maynard following this concerning diagnosis.

485. Ms. L. Deaton responded on March 29, 2023, *"Yes, with Dale's permission, it was canceled."*

486. On or around March 20, 2023, Ms. D. Maynard stated in writing that she is required to send all of J.K.D.'s information to GAL Brantley.

487. On or around March 21, 2023, without Mr. D. Deaton's consent as a legal custodian, Ms. D. Maynard stated that she speaks to GAL Brantley to provide updates to her from time-to-time at Ms. D. Maynard's discretion even after Mr. D. Deaton directly asked that it stop.

488. During the same time period, Ms. D. Maynard refused to speak to Mr. D. Deaton after sending concerning communication regarding alleged information regarding concern for J.K.D.'s well-being in Maryland.

489. Mr. D. Deaton's legal counsel requested communication from Ms. D. Maynard about these safety issues.

490. Once again, Ms. D. Maynard refused to communicate with Mr. D. Deaton or his counsel.

**NN.** **Dr. Blotcky, the Court Appointed Expert, Illegally Practices in Multiple States Without a License.**

491. On or about February 22, 2022, Attorney Drennan had an off the record conversation with Judge Stephens wherein Attorney Drennan alleged that Dr. Ackerson, the then court appointed psychologist, had a conflict due to Ms. T. Peake previously sitting for an evaluation with Dr. Ackerson.

492. Ms. T. Peake had previously and voluntarily sat for a psychological evaluation with Dr. Ackerson that was subject to a HIPAA Protective Order before Judge Chappell and allegedly under seal in Judge Chappell's chambers.

493. There was no hearing before Judge Stephens to confirm any of these off the record discussions with Attorney Drennan.

494. On February 23, 2022,  Judge Stephens entered an order setting aside her prior December 21, 2021 order for a psychological evaluation by Dr. Ackerson and ordering Mr. D. Deaton and Ms. L. Deaton to submit to a licensed psychologist to conduct a full mental evaluation with the protocol approved by the APA.

495. On March 15, 2022, Attorney Duncan made an appointment with Dr. Blotcky for Ms. L. Deaton's first session.

496. Attorney Drennan and Attorney Duncan demanded that Dr. Blotcky would be the appointed psychologist to evaluate Mr. D. Deaton and Ms. L. Deaton.

497. Additionally, upon information and belief, Attorney Duncan demanded that Dr. Blotcky discuss the sessions with them, set the order of the evaluations with them, and provide Ms. L. Deaton's evaluation to her by mail through the US postal service to her address in Maryland.

498. Dr. Blotcky is also a psychologist that conducted a voluntary psychological evaluation for Ms. T. Peake prior to Ms. C. Taylor's directive that the psychological evaluation be done before Dr. Ackerson.

499. Based on Attorney Drennan's representations to Judge Stephens, Attorney Drennan knew or should have known that Dr. Blotcky had a conflict.

500.  On June 24, 2022, Dr. Blotcky delivered his report to Attorney Drennan and an attorney for Mr. D. Deaton by email.

501.  Against the APA guidelines and Judge Stephens' order, Dr. Blotcky did not receive any supporting information from either party or follow APA protocol.

502.  Dr. Blotcky does not have a license to practice medicine in the state of Maryland.

503.  Dr. Blotcky had multiple virtual interviews with Ms. L. Deaton, in violation of Maryland and Alabama law and in violation of APA guidelines.

504.  Dr. Blotcky mailed Ms. L. Deaton a test in Maryland.

505.  Ms. L. Deaton allegedly took the psychological evaluation in Maryland without supervision and later mailed back the test to Alabama.

506.  It is unknown who filled out the unsupervised test before it was returned to Dr. Blotcky, but the test plainly does not reflect Ms. L. Deaton's personality or acts before the court.

507.  After being asked about the way Dr. Blotcky practiced medicine in this case, Dr. Blotcky admitted that the evaluations were not administered properly.

508.  Dr. Blotcky did not take any steps to correct his report.

509.  After this phone call regarding his violation of APA guidelines, Dr. Blotcky refused to respond to Mr. D. Deaton's legal counsel further.

**OO.   Attorney Drennan advised Ms. L. Deaton to file a crossclaim against D. Deaton for custody with no change of circumstance and later admitted custody was not at issue but refused to amend or withdraw the claim.**

510.   Attorney Drennan advised Ms. L. Deaton to file a crossclaim against Mr. D. Deaton that was filed on May 16, 2022, even though Attorney Drennan knew at all times relevant that there had been no change of circumstance for Ms. L. Deaton to seek a change in custody.

511.   This crossclaim requested Judge Stephens awarded Ms. L. Deaton with "sole legal and sole physical custody" of J.K.D., L.W.D., and R.E.D.

512.   On December 9, 2022, Attorney Drennan and Ms. L. Deaton admitted to Judge Stephens that custody should no longer be at issue, but did not alter, amend, or withdraw the complaint.

513.   Instead, Attorney Drennan attempted to cover up her bad acts with Dr. Blotcky's report produced against APA guidelines insisting they were "no longer relevant or material for the Court to consider".

514.   On December 9, 2022, Attorney Drennan represented "Since that time, the Father's petitions have been dismissed with prejudice, and custody is no longer at issue before this Court. That as custody is not at issue between the parties, Dr. Blotcky's reports are no longer relevant nor material for the Court to consider at the trial of the Mother's counterpetition."

515. Judge Stephens entered an order denying Mr. D. Deaton the right to share his children's testimony with Dr. Blotcky that directly discredited Dr. Blotcky's report.

516. On May 5, 2023, while Ms. L. Deaton was sworn in and asked whose idea it was to file a cross claim, Attorney Drennan directed her not to answer and stated "Don't answer. It invades attorney-client privilege." When counsel for Mr. D. Deaton questioned this by asking: "If it's her idea, how is that –?"; Attorney Drennan interrupted and stated again, "I'm telling you it invades attorney-client privilege."

517. On May 5, 2023, Attorney Drennan at least tactically acknowledged that it was Attorney Drennan who encouraged Ms. L. Deaton to file a crossclaim against Mr. D. Deaton even though Attorney Drennan knew at all times relevant that the crossclaim was without merit as no change had occurred that would entitle Ms. L. Deaton to a change in circumstance.

518. The crossclaim did however directly balloon Attorney Drennan's profits that she demanded and received from Southern Maryland Dredging, Mr. C. Wilson, Ms. R. Wilson, and Ms. Goldman.

**PP.   GAL Brantley Falsely Imprisoned J.K.D., L.W.D, and R.E.D. Against Their Consent and Against the Consent of Mr. D. Deaton During Trial**

519. On June 29, 2022, Ms. T. Peake and Mr. D. Deaton approached the conference room where Plaintiff L.K.D., L.W.D., and Plaintiff R.E.D. were

being held by GAL Brantley to take them home since they were not testifying that day and trial was beginning.

520. Mr. D. Deaton and Ms. T. Peake observed GAL Brantley standing between the Plaintiff minor children yelling and refused to allow the children to leave the conference room.

521. Judge Stephens exited her chambers waving her arms and screaming about allegations in the Deaton case regarding private matters of the children in the waiting area in front of the general public.

522. Judge Stephens proceeded to communicate *ex parte* with Attorney Drennan, Attorney Duncan, and Defendant GAL Brantley - while Mr. D. Deaton's legal counsel was not present.

523. After Judge Stephens left her chambers and while she was standing in the lobby close to Attorney Drennan, Attorney Drennan assaulted Ms. T. Peake. Attorney Duncan attempted to restrain Attorney Drennan. Judge Stephens can be seen in the same frame of the video when the assault occurs. There is now a pending case of assault and other relief before Hon. D. Hatcher in Jefferson County Circuit Court. Attorney Drennan hired Attorney Robert Mackenzie, the attorney frequently used by The Enterprise as a fixer, to represent her in the assault case.

524. J.K.D., L.W.D., and R.E.D. were held in a closed conference room with a bailiff for approximately (2) hours.

525.   Attorney Duncan received text communication from GAL Brantley and joined the room to hold the minor children.

526.   On the night of June 29, 2022 at or around 7:30 PM CT, GAL Brantley confirmed to Mr. D. Deaton's attorney on a phone call that GAL Brantley did not allow J.K.D., L.W.D., and R.E.D. to leave the room.

527.   GAL Brantley stated "No they are not going" [to leave] and "I was not about to let them leave with her [their stepmother]."

528.   On the same call on the night of June 29, 2022 at or around 7:30 PM CT, GAL Brantley discusses her attempts to bully Ms. L. Deaton to pursue additional litigation stating in part: "I was trying to calm Leanne down because she was on the phone crying."

529.   And further stating: "I have had moments myself where I have even told mom. This has been the most passive woman. Let me say one of the most passive women I have had to deal with that has just pissed me off. And have told her and I have told her attorney- I have told Jessica. She is milly-moused, doesn't stand up, gives in, and that's why we are where we are today. She's the one who always gives in. She can't stand up. She hasn't stood up." [sic]

**QQ.   Judge Stephens Dismisses Mr. D. Deaton's Custody Case with Prejudice after Attorney Drennan Represents his Discovery is Deficient.**

530. On June 29, 2022, Judge Stephens directs that she is dismissing Mr. D. Deaton's custodial case with prejudice and instructs Attorney Drennan and Attorney Duncan to continue with their crossclaim on the first day of trial.

531. The dismissal with prejudice was based on Attorney Drennan's representation that Mr. D. Deaton's discovery was deficient.

532. Attorney Drennan further represented that she did not owe Mr. D. Deaton nor his counsel a deficiency letter as to what the alleged discovery deficiency was.

533. Attorney Drennan and Attorney Duncan previously refused to make copies of Mr. D. Deaton's discovery at his home, when he was pro se.

534. Mr. D. Deaton is left without an opportunity to raise his claims for custody of his children in state proceedings with this unlawful dismissal with prejudice against well-established substantive and due process laws.

**RR. Judge Stephens Conducts a Secret Phone Call About the Deaton Case.**

535. On or around August 12, 2022, Judge Stephens had an off-the-record phone call with a third party about Ms. L. Deaton and Mr. D. Deaton's post custody divorce case.

536. Defendant Judge Stephens briefly described the call in an off-the-record discussion with attorneys, after removing the court reporter from the call, and insisting that no participants record the call.

537. As of the time of this filing, Judge Stephens has refused to disclose the identity of the caller or the nature of the phone call on the record despite multiple requests by Mr. D. Deaton's counsel.

538. It is clear from the limited amount Judge Stephens revealed that Judge Stephens knew the caller, discussed the case, and then refused to reveal this call on the record to prevent the parties from conducting discovery on her *ex parte* phone call.

**SS.  GAL Brantley Makes 17 False Statements to the Alabama State Bar.**

539. On September 16, 2022, GAL Brantley knew she had to misrepresent and suppress material facts to the Alabama State Bar to stay in Ms. L. Deaton and Mr. D. Deaton's post divorce custody case and continue improper billing.

540. GAL Brantley made at least **17** false statements to the Alabama State Bar, because GAL Brantley knew her actions were wrongful, willful, and malicious.

541. On November, 22, 2022, Mr. D. Deaton's attorney provided an affidavit regarding Defendant GAL Brantley's unwillingness to withdraw from the case despite being requested to withdraw by email on October 31, 2022.

542. The request came after GAL Brantley asked Judge Stephens to tax attorney's fees for her daughter and co-resident, JA Brantley, against Mr. D. Deaton.

543.   GAL Brantley was undeterred by the inherent conflict of interest of asking for third party fees while simultaneously representing J.K.D., L.W.D., and R.E.D, because GAL Brantley knew she would receive top cover from Judge Stephens.

**TT.   Ms. T. Miller Administers Psychological Testing to Plaintiff's L.W.D. and R.E.D. Without Any Notice to Mr. D. Deaton.**

544.   On January 25, 2023, Ms. T. Miller conducted medical testing and an evaluation in Maryland to L.W.D. and Plaintiff R.E.D. without prior notice to or the consent of Mr. D. Deaton as a joint legal guardian.

545.   Ms. T. Miller reported the results were concerning on February 27, 2023 via email. The test was administered at the end of the only month in the calendar year when the court order for the custody schedule does not include parental visitation for Plaintiff J.K.D, L.W.D., R.E.D. with their father. Ms. L. Deaton has never agreed to custodial visitation in January, despite multiple requests.

546.   Ms. T. Miller did not report the results of the report until February 27, 2023 despite having the results with her at all times relevant.

**UU.   Judge Chappell Uses Public Property While on Duty During Business Hours to Film Campaign Video Advertisements Against Ms. T. Peake's Attorney and Then Refuses to Recuse.**

547.   During the 2022 judicial campaign for the Tenth Judicial Circuit of Jefferson County Domestic Relations Court of Alabama, Judge Chappell stood in her

formal robe campaigning on public property during business hours while on duty to the voters of Jefferson County promoting her friend Carla Morton as the next judge to take her seat against the plain language of the Canons of Judicial Ethics.

548. Judge Chappell, against the plain language of the Canons of Judicial Ethics, actively campaigned against Adrienne Moffett Powell's judicial campaign opposing Ms. T. Peake's political speech and campaign efforts for her attorney practicing before Judge Chappell.

549. Judge Chappell used taxpayer dollars on official time and on courthouse property giving the false imprimatur of the Jefferson County Domestic Relations Court to sway the electorate to electing her friend, Ms. Carla Morton, and strengthen the grip of The Enterprise.

550. The campaign video depicting the above acts and Judge Chappell's continued efforts at campaign rallies and fundraisers were levied against judicial candidate and now Judge Adrienne Moffett Powell, who was Ms. T. Peake's attorney practicing before Judge Chappell in her custodial case.

551. On or around April 2022, the video of Judge Chappell's advertisement opposing Adrienne Moffett Powell's judicial campaign was posted online.

552. On or around April 2022, Judge Chappell's reposted her support of the video in a public social media post.

553.   Judge Chappell knew through rallies and public events that Ms. T. Peake was campaigning for her friend and attorney.

554.   Judge Chappell was further put on notice through multiple requests for her recusal.

555.   At all times relevant, Judge Chappell refused to recuse and retaliated against Ms. T. Peake.

556.   Judge Chappell admitted on the record of a certified transcript that she did not thoroughly review Mr. S. Wyatt and Ms. T. Peake's case and asked the Alabama Court of Civil Appeals for "help" in an outcry on the record of the case.

557.   After admitting she did not thoroughly review the case, Judge Chappell awarded her friends, GAL Wess and the attorneys of Crittenden Partners: Attorney Montgomery Lee, Defendant Attorney Crittenden, Attorney Yarbrough, and Defendant Attorney Gregory, a total of $160,398 without requiring them to prove their fees or allowing Ms. T. Peake to question their fees.

558.   Judge Chappell entered this retaliatory order awarding a disproportionate amount of the unproven legal fees after Ms. T. Peake and two other corporate parties asked for her recusal.

559.   Judge Chappell states in her order that Ms. T. Peake was taxed with legal fees for the recusal hearing.

560. Judge Chappell fails to acknowledge or state in her order that three separate parties requested her recusal following these inappropriate events.

561. After Judge Chappell entered her order, Judge Chappell unofficially left her office and stopped working, including refusing to hear emergencies, while continuing to receive money from the State of Alabama.

**VV.  Judge Stephens Recuses from Ms. T. Peake's custodial case. Then, Judge Stephens Takes Evidence from Ms. T. Peake's Case and Provides it to Attorney Drennan and Attorney Duncan.**

562. Judge Stephens recuses from Ms. T. Peake's custodial case on January 17, 2023.

563. For approximately one year prior to Judge Stephens recusal, Ms. T. Peake had a motion and relief pending for the benefit of sealing her child's records that were improperly in Mr. D. Deaton's case.

564. On or around January 26, 2023, Judge Stephens asked Attorney Duncan and Attorney Drennan to come review evidence from Ms. T. Peake's confidential case.

565. This evidence was not before Judge Stephens' court, but somehow, Judge Stephens obtained it and stated in writing that it was in her chambers.

566. Judge Stephens gathered evidence on multiple occasions that was not before her court.

567. Judge Stephens refused Ms. T. Peake access to an evidentiary hearing in her court regarding G.M.W.'s records and further refused to transfer the case to an unbiased court.

**WW. Three Attorneys Conspire with Attorney Drennan and Attorney Duncan to Provide False Sworn Statements to the Alabama Court of Civil Appeals.**

568. On January 31, 2023, Attorney Jones swore to an affidavit that was filed through Attorney Drennan on February 8, 2023 with the Alabama Court of Civil Appeals.

569. This affidavit contains false statements that are disproved with video evidence from the courthouse.

570. Attorney Jones is a judge in municipal court in the City of Homewood, AL and knew or should have known how inappropriate these actions were.

571. On February 7, 2023, Attorney Crew and Attorney Vineyard swore to an affidavit through Attorney Drennan that was filed with the Alabama Court of Civil Appeals on February 8, 2023.

572. This affidavit contains false statements that are disproved with video evidence from the courthouse.

573. On July 2, 2020, Attorney Crew and Attorney Vineyard received a payment from Mr. D. Deaton to provide legal advice to him in this same case by check made payable to Crew Law Group that was deposited in their Regions Bank account.

574. Upon information and belief, Crew Law Group is not a properly formed legal entity.

## XX.   Judge Stephens Makes Four False Statements to the Alabama Court of Civil Appeals to Cover Up Her Bad Acts.

575. Judge Stephens elected to file a response brief to Mr. D. Deaton's mandamus which contained at least the four following unsupported and blatantly false statements:

(1) Judge Stephens represented that, while Mr. D. Deaton was acting pro se, "opposing counsel offered to pay a neutral third-party company to make the copies" of the discovery requested. This statement is unsupported by the record, both before the Court of Civil Appeals and in the trial court's record and is not even argued by the opposing party. Mr. D. Deaton has no knowledge of any such offer.

(2) Similarly, Judge Stephens misrepresented the statements made and purpose of an off-record virtual conference with all counsel. Prior to the mandamus, Judge Stephens abruptly scheduled a virtual hearing with counsel when no motions or reason for a hearing was before the court. Though a court reporter was scheduled, Judge Stephens would not permit the reporter into the virtual Zoom "room," then pressed counsel to proceed with the hearing without a reporter. Plaintiff P. Deaton's attorney requested permission to record the hearing as no reporter was present and counsel was not aware of the purpose of the hearing. This

request to record was denied. Judge Stephens then proceeded to disclose, without detail, that she had received a call from someone discussing this case, its outcome, and negatively portraying Mr. D. Deaton's counsel. After Judge Stephens recounted a summary version of the call, she terminated the hearing without taking any questions or identifying the caller. Mr. D. Deaton's counsel then filed a motion to clarify the length of the call, identity of the caller, and other information so as to investigate. This motion was denied. Mr. D. Deaton's counsel then, at the next scheduled in-person hearing, requested that the disclosure be placed on the record, which also was denied. Then, after denying a motion to recuse based in part on the shielding of the caller from disclosure, Judge Stephens falsely stated to the Court of Civil Appeals that the purpose of the hearing was to "serve as a reminder that this civil action was confidential and that neither party or attorney to this civil action should be discussing this case in violation of this court's order" and, more directly and wrongly, "this Court held a hearing to remind the parties that the case was confidential and there should be no discussion about the case." At no point did Judge Stephens admonish or remind the parties or counsel of the confidential nature of the proceeding except in her response to Mr. D. Deaton's petition, nor did she ever expressly or impliedly state that the purpose of the disclosure was to make such an admonishment. Judge Stephens then brazenly supposed to the appellate court that "[i]f anything, the remarks show that one of the attorneys or parties may have violated the orders of the court." Again, no such statement was ever made

prior to Defendant P. Stephen's response brief, nor was the disclosure sufficiently detailed to even reach such a supposition.

(3) Regarding this hearing, Judge Stephens further misrepresented that she "relayed the comments to the parties in open court while all the parties were present." This was not so. The day before the hearing, the Court's assistant emailed all counsel informing them of the hearing and stating that "[o]nly the attorneys need to be present."

(4) Further, when Mr. D. Deaton raised as a basis for his petition that Judge Stephens stated he "had an evil eye," [sic] which appears in a transcribed record, Judge Stephens's response was that the court reporter "may have misheard" what she said. (Stephen's Resp. at 20) Prior to the mandamus, Mr. D. Deaton's counsel moved for recusal based in large part on this statement, which she did not address or attempt to correct when summarily denying his motion. When his counsel later orally moved for recusal, again mentioning this statement, she -again- did not attempt to correct the record. Only after raising it to an appellate court on mandamus, which enclosed the written transcript demonstrating the statement, did Judge Stephens claim it was an erroneous statement. Tellingly, Judge Stephens has not attempted to correct this alleged error in subsequent proceedings following the petition.

**YY.   Judge Stephens Orders Mr. D. Deaton's Attorneys in State and Out of State to Destroy Legally Subpoenaed Evidence.**

576. A dispute over records arose from Attorney Drennan and Attorney Duncan alleging that Ms. L. Deaton's mental health records could not be obtained and held by Mr. D. Deaton's legal counsel.

577. Attorney Drennan and Attorney Duncan knew at all times relevant that this was improper and did not follow the law.

578. On May 5, 2023, Attorney Drennan admitted that she subpoenaed Mr. D. Deaton's mental health records on Ms. L. Deaton's behalf.

579. Attorney Drennan did not follow any such procedure for Mr. D. Deaton's therapy records at that time as Attorney Drennan later alleged was required by law.

580. This hide-and-destroy legally obtained evidence scheme obstructed justice, caused substantial financial damage, prevented Mr. D. Deaton from seeking relief for his minor children with proper evidence, and substantial increased legal fees for Mr. D. Deaton and Ms. L. Deaton.

581. On January 20, 2023 at 3:56 PM ET as stamped by the Anne Arundel County electronic filing system of record, Judge Pamela J. Alban of the Circuit Court for Anne Arundel County entered an order denying Ms. L. Deaton's Motion for Protective Order and/or to Quash Subpoena regarding these mental health records.

582. On February 7, 2023 at 11:20 AM ET as stamped by the Calvert County electronic filing system of record, Judge Mark W. Carmean of the Circuit

Court for Calvert County entered an order denying Ms. L. Deaton's Motion for Protective Order and/or to Quash Subpoena regarding these mental health records.

583. Judge Stephens was required to give full faith and credit to the Maryland courts' determination that no privilege, or other valid objection, should prevent Mr. D. Deaton from receiving the requested records.

584. Judge Stephens was required to accord the two Maryland Circuit Courts full faith and credit in determining that no privilege, or other objection, prohibits production of the requested records, and Judge Stephens refused to do so even after being put on notice of the issue multiple times.

585. On March 1, 2023, Judge Stephens entered an order stating in part:

"It is further ordered that the Father and his attorneys in Alabama and Maryland shall destroy any documents produced pursuant to the subpoenas issued in Maryland." This order was entered on March 1, 2023 at 11:48 AM CT as electronically stamped by the Alafile system.

586. In the same March 1, 2023 Order from Judge Stephens, Judge Stephens further orders that a special master oversee Ms. L. Deaton's subpoenaed records and determine if the subpoenaed records contained any protected information.

587. The appointed special master contributed more money to Judge Stephens' most recent judicial campaign than Judge Stephens herself contributed.

588. Judge Stephens worked *ex parte* with Attorney Drennan and Attorney Duncan to obtain a copy of the disputed evidence in the Court's chambers that Mr. D. Deaton's attorneys were ordered to destroy.

589. Judge Stephens ordered Mr. D. Deaton and Mr. D. Deaton's attorneys in Alabama to destroy legally obtained evidence through court subpoena to cover up the bad acts complained of herein.

590. Judge Stephens further ordered Mr. D. Deaton's attorneys 779 miles away in the state of Maryland to destroy legally obtained evidence through court subpoena that Maryland Courts had already upheld as proper.

591. Judge Stephens does not even hold a license to practice law in the state of Maryland.

592. Judge Stephens knew or should have known she did not have jurisdiction outside of her state jurisdiction in Alabama.

## ZZ. Judge Stephens ejects T. Peake's attorney from her courtroom multiple times without any stated reason.

593. On December 17, 2021, legal counsel for Ms. T. Peake was ejected without any stated cause from a Zoom hearing in which she tried to represent Ms. Peake on an issue regarding her minor child's information.

594. On June 29, 2022, legal counsel for Ms. T. Peake was ejected without any stated cause from Judge Stephens' courtroom while attempting to represent Ms. T. Peake on an issue regarding her minor child's information.

595. On January 17, 2023, Judge Stephens recuses herself from Ms. T. Peake's custodial case over her minor child through the presiding judge of the circuit. However, Judge Stephens refuses to recuse from Mr. D. Deaton's case or transfer it to an unbiased court, where Ms. T. Peake has an issue pending regarding her child's records and is a key witness.

**AAA. GAL Wess Attempts to extort Ms. T. Peake to Cease Interfering with parental and custodial rights for $40k.**

596. On or around March 13, 2023, GAL Wess attempts to extort T. Peake to cease interfering with T. Peake's parental and custodial rights for $40,398.

597. GAL Wess attempted to extort Ms. T. Peake to pay $40,398 for his alleged legal fees without questioning, challenging, or objecting to GAL Wess' alleged fees.

598. GAL Wess submitted his demand through email on the night before a hearing in which the Judge May stated on the record that she was dismissing GAL Wess from his role as the GAL for G.M.W. after Mr. S. Wyatt and Ms. T. Peake agreed to the same.

**BBB. Attorney Yarbrough and Attorney Gregory removed sealed records from Judge Chappell's chambers; Judge Chappell admits it was wrong but prohibits them from being called to testify.**

599. In Ms. T. Peake and Mr. S. Wyatt's custodial trial on or around November 2022, Attorney Yarbrough and Attorney Gregory admitted on the record that

they removed Ms. T. Peake's sealed medical records from Judge Chappell's chamber with the permission of Judge Chappell's staff.

600. Judge Chappell stated on the record that this was not the proper procedure, but then refused to allow Ms. T. Peake to call Attorney Yarbrough or Attorney Gregory as a witness.

601. In an off-the-record conversation with Judge Stephens, Attorney Drennan reported to Judge Stephens that Ms. T. Peake sat for a psychological evaluation in the case by Judge Chappell with Dr. Ackerson at least tacitly confirming this collusion.

602. On May 14, 2023, Attorney Gregory admits again to Judge May that Attorney Yarbrough and herself admitted to taking sealed records from Judge Chappell's chambers, but stated it was with permission from Judge Chappell's staff.

603. Crittenden Partners shares the psychological evaluation with multiple attorneys, including Attorney Lee, who expressly stated that he was not an attorney for any of Mr. S. Wyatt's custodial matters.

**CCC. Judge May Refuses to Order Ms. T. Peake and Mr. S. Wyatt's Stipulations and Agreement on the Record, Including the Removal of GAL Wess.**

604. Judge May was assigned Ms. T. Peake's custody case in January 2023.

605. At all times relevant, Judge May was directly supervised by Judge Stephens.

606. Judge Stephens used the authority of her office to influence, if not dictate, the outcome of cases not assigned to her.

607. On March 14, 2023, Judge May heard post judgement issues for at least six hours straight and agreed to legal briefing from Ms. T. Peake and Mr. S. Wyatt on the issues before her Court.

608. On the same day, the parents agreed for GAL Wess to be removed as GAL and further agreed to additional stipulations correcting parts of Judge Chappell's order that violated Ms. T. Peake and G.M.W.'s constitutional rights in front of Judge May.

609. After hearing the stipulations and an agreement from Ms. T. Peake and Mr. S. Wyatt on the record before her Court on March 14, 2023, Judge May denied all relief before her Court including Ms. T. Peake and Mr. S. Wyatt's stipulations.

610. This written order by Judge May was against her own stated concerns and directives from the bench that at least one of the paragraphs from Judge Chappell's order would be eliminated.

611. Upon information and belief, Judge Stephens directed actions in Ms. T. Peake's case, in which she was not assigned.

612. Judge May was obligated to use her our judgement to decide the cases before her, order stipulations of the party, and overturn rulings that clearly violated the Constitution, but she failed to do so.

**DDD. Despite His Dismissal as GAL, GAL Wess Continues to Litigate in the Alabama Court of Civil Appeals Without Any Authority or Authorization.**

613.   On March 14, 2023, GAL Wess stated on the record that he understood that he was dismissed from the Peake/Wyatt custodial case after Ms. T. Peake and Mr. S. Wyatt agreed to his dismissal and Judge May directed it from the bench.

614.   On May 30, 2023, GAL Wess knowingly and without authority filed a motion purporting to be on behalf of G.M.W. to a superior court.

615.   GAL Wess' motion filed on May 30, 2023 with the Alabama Court of Civil Appeals asked the court to dismiss Ms. T. Peake's appeal.

**EEE. Alabama Counselor Agrees to See Deaton Minor Children to Provide Assistance at Mr. D. Deaton's Request for Help; GAL Brantley and Attorney Drennan Collude to Direct the Medical Care of the Minor Children.**

616.   On April 8, 2023, Attorney Drennan and GAL Brantley colluded to threaten an Alabama counselor invoking Judge Stephens name to garner the desired result.

617.   Attorney Drennan made at least 4 false statements to the minor children's prospective Alabama counselor:

 (1) Attorney Drennan stated Mr. D. Deaton has a lack of authority to direct mental healthcare treatment of his minor children. This is not true and at all times relevant Attorney Drennan knew that was not true, as Mr. D. Deaton has joint legal custody

of the minor children (in which she does acknowledge) and Ms. L. Deaton does *not* have a tie breaking authority over medical decisions.

 (2) Attorney Drennan states the Mr. D. Deaton's alleged lack of authority to direct mental healthcare treatment of his children is due to [Mr. D. Deaton] "*historically interfered with the girls' mental health care which is why she was awarded such authority*". This is not true and at all times relevant Attorney Drennan knew that was not true. There has never been an evidentiary hearing wherein the Mr. D. Deaton's joint legal rights to the children's healthcare or the tie-breaking authority was altered.

(3) Attorney Drennan states to the prospective Alabama counselor: that: "*you have not been recommended by the girls' counselor nor their medical providers.*" This is not true and at all times relevant Attorney Drennan knew that was not true. Mr. D. Deaton provided notice to the Defendant that he contacted the children's doctor's office in Maryland and Alabama, and further that he contacted all of the counselors Mayfair Medical Group mentioned including the prospective Alabama counselor.

(4) Attorney Drennan states to the prospective Alabama counselor that: "*additionally there has been no recommendation that the girls seek additional counseling outside of their current medical providers.*" This is not true and at all times relevant Attorney Drennan knew that was not true. In fact, the counselor states that the minor child J.K.D. has not improved [in her care]. The counselors for all of the minor children have sent many communications regarding getting the

minor children additional help, including but not limited to communication regarding additional help on the following dates: February 6, 2023, February 27, 2023, and March 20, 2023

618.   Attorney Drennan was put on notice of these false statements on the same day at 8:02 PM. At all times relevant, Attorney Drennan did not correct these false statements.

619.   Attorney Drennan further threatened to seek injunctive relief against the Alabama board certified counselor and even mentions Judge Stephens by name as a means to intimidate and bully.

620.   The Deaton minor children still do not currently have access to counseling in Alabama.

621.   Ms. D. Maynard has been clear that J.K.D.'s symptoms have not improved in her care and has encouraged the parents to seek additional help from the child's doctors.

622.   Ms. T. Miller recommended a discussion with Plaintiffs L.W.D. and R.E.D. doctors on February 27, 2023.

623.   On April 8, 2023, GAL Brantley sent one email to Mr. D. Deaton and Ms. L. Deaton asking why the minor children needed a counselor in Alabama.

624.   Six minutes later, GAL Brantley , under the color of state law, emailed the prospective Alabama counselor and directed the minor children's medical care stating her opinion of their counselors in Maryland (although ignoring

their actual stated advice) and further directed that the GAL Brantley was opposed to this "last minute attempt before trial" to have the girls seen [by a board certified medical provider] in Alabama.

625. GAL Brantley works on behalf of the Judge Stephens' court and makes the following false statement to the prospective Alabama counselor: "*Per order of the court, Leanne makes decisions concerning the girls mental health and she has been a true advocate for each of them.*" *and* further states *"I hope you reconsider getting involved in this matter as it is not in my clients best interest."*

626. GAL Brantley was put on notice of this false statement on the same day at 8:02 PM.

627. At all times relevant, GAL Brantley did not correct her false statement.

628. GAL Brantley continues to speak on behalf of the Ms. L. Deaton, including to state what she believes Ms. L. Deaton will sign as a release [and the Defendant does sign a release for GAL Brantley] and further legally represents Ms. L. Deaton by discussing only the Ms. Deaton's alleged advocacy for the minor children.

629. GAL Brantley knew at all times relevant that Ms. L. Deaton does not make all decisions concerning the minor children's mental health and further takes a position <u>under the color of state law</u> as to what is in the minor children'

best interest to a board-certified medical provider over Mr. D. Deaton's objections and without any communication with their father, Mr. D. Deaton.

630. J.K.D., L.W.D., and R.E.D. were unable to see the counselor directly due to the actions of Attorney Drennan and GAL Brantley.

**FFF. Judge Stephens Enters an Order Denying Mr. D. Deaton his Right to use Documents from his Case to Report the Criminal and Illegal Activity Detailed in this Complaint to State and Federal Regulatory Agencies.**

631. Judge Stephens emailed Attorney Drennan, Attorney Duncan, GAL Brantley and counsel for Mr. D. Deaton on April 25, 2023, stating she would be granting Mr. D. Deaton's Motion to Lift Seal on Confidential Documents and requesting a proposed order.

632. Attorney Duncan objected via an email sent directly to Judge Stephens and soon after Attorney Drennan filed an objection.

633. On April 30, 2023, at 7:16 PM CT, Judge Stephens entered the following order after exchanging an email with Attorney Duncan:

"THIS CAUSE is before the Court on the PLAINTIFF'S MOTION TO LIFT SEAL ON CONFIDENTIAL DOCUMENTS, the Defendant's Objection and the Plaintiff's Reply thereto. The Plaintiff's Motion was filed on 4/18/2023 at 4:52 P.M. There being no objection by 04/25/2023, the Court emailed all parties at 11:44 AM and requested a proposed order from the Plaintiff. The motion was filed eight days before the Court asked for a proposed order. Defendant then emailed that they

would file an objection and such was filed on 04/25/2023 at 12:45 PM. The Plaintiff then filed a reply on 04/25/2023 at 1:45 PM. The Court was inclined to grant the motion because there was no objection, however since there is an objection filed some eight days after the motion, the court must now address the motion and the objection. The Plaintiff's motion broadly and vaguely asks that the seal be lifted for the limited purpose of providing documentation to state and federal regulatory bodies. It is of note that "Counsel for both parties waived any and all notice and consented to the record in this cause, all pleadings, Orders, records, videos, recordings, documents, and transcripts from any and all hearings or trials held in this cause being designated as confidential." The following order is due to be entered. It is therefore, ORDERED, ADJUDGED AND DECREED, That the Plaintiff's Motion to Life Seal on Confidential Records is hereby Denied."

634. After inviting an objection via email, Judge Stephens denies Mr. D. Deaton from using documents from his case to report criminal activity to state and federal regulatory bodies to seek any relief.

635. At all times relevant, Judge Stephens knew or should have known that her actions were criminal, unconstitutional, and directly financially supporting an association-in-fact to further this fraud.

636. In an effort to prevent the Plaintiffs from relief of their criminal activity, Judge Stephens denied Mr. D. Deaton's right to share information from his

case, including his children's testimony, with state and federal regulatory bodies.

## EXHAUSTION OF LEGAL REMEDIES

637.   There is no grievance procedure or legal action available to the Plaintiffs for all the violations pled herein.

638.   Plaintiffs T. Peake and D. Deaton filed complaints with the Judicial Inquiry Commission; however, the Judicial Inquiry Commission informed the Plaintiffs that they were without jurisdiction to hear the violations pled herein.

639.   Plaintiffs T. Peake and D. Deaton filed with the Alabama State Bar against multiple co-defendants wherein the co-defendants made false statements.

640.   Ms. T. Peake and D. Deaton filed with the Alabama Court of Civil Appeals and on cert to the Alabama Supreme Court, which they declined to review or did not provide substantive opinions or relief to address this illegal activity.

641.  The relevant or applicable appellant courts and regulatory bodies have refused to review or rectify these breaches of public trust.

642.  Plaintiffs T. Peake and D. Deaton have repeatedly, through appeals, regulatory complaints, and to the Presiding Judge of the 10th Judicial Circuit of Jefferson County, have sought any relief from the illegal actions complained of herein, all to no avail, and each refusing to review the issues on the merits. Any further attempts to rectify these wrongs and prevent these continued violations would be futile.

643.  Further attempts and regulatory review of the above-mentioned issues have been further curtailed as Judge Stephens blatantly refuses to allow Mr. D. Deaton to share documents from his case with state or federal regulatory bodies. Judge Stephens directly denied Mr. D. Deaton the right to share evidence of this illegal activity, so Judge Stephens could cover up The Enterprise's illegal activity.

644.  The co-defendants have been allowed to make unchecked, false statements to appellant courts and regulatory bodies to cover up The Enterprise's illegal activity.

# CLAIMS

## Count I

## DEPRIVATION OF RIGHTS UNDER COLOR OF LAW
(U.S. Const. amend. I; amend. IV; amend. IX; amend. XIV;
42 U.S.C. § 1983; TITLE 18, U.S.C., Section 242)
(Against All Defendants)

645.   Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

646.   The pattern and practice of misconduct at Jefferson County Circuit Court Domestic Relations Division occurred with the consent and direction of the The Enterprise, who personally knew about, facilitated, approved, and/or condoned this pattern and practice of misconduct, or at least recklessly disregarded the substantial risk of serious harm posed by the actions and inactions described in the preceding paragraph.

647.   Defendants' actions and inactions set forth above were deliberately indifferent, malicious, willful, beyond their authority, and/or recklessly indifferent to the substantial risk they knew the Plaintiffs' faced and were objectively unreasonable.

648.   The Defendants participation in The Enterprise violated the Plaintiff's constitutional rights as they received top cover from Judge Stephens, Judge Chappell, and Judge May.

649. Upon information and belief, benefits and favors were traded that deprived the Plaintiffs access to a fair tribunal.

650. The Enterprise and each of its members current and former, acted in concert and individually knowingly, consciously, or reasonably should have known their actions were driving Plaintiffs of their constitutionally protected rights pursuant to the 1st, 4th, 9th, and 14th Amendments of the Constitution.

651. The Enterprise's actions were under color of state law because there condoned, authorized, or expressly or impliedly directed by Judge Stephens, Judge Chappell, and Judge May.

652. The Defendant members of The Enterprise further acted under color of law because of the pervasive nature of this scheme to increase profits and based on the Defendant judges' failure to supervise, failure to correct, failure to prevent harm and further to ignore the rule of law. The pattern of the The Enterprise to violate constitutionally protected rights of citizens for at least 10 years have occurred unchecked. It has become so pervasive as to constitute approval by Defendant Judges and bring The Enterprise's acts within the color of state law, so as to lend the power and authority of the state to The Enterprise.

653. The Defendants' misconduct directly and proximately caused the serious injuries the Plaintiffs' suffered from these attacks.

654. By way of examples but not exclusion, The Enterprise violated the Plaintiff's constitutionally protected rights jointly and severely in at least the following ways:

**Procedural Due Process – Notice.**

655. Judge Stephens prevented Mr. D. Deaton from ever calling GAL Brantley as a witness or deposing GAL Brantley to prove the reasonableness of her alleged fees.

656. Judge Chappell prevented Ms. T. Peake from every calling GAL Wess as a witness or deposing GAL Wess to prove the reasonableness of his alleged fees.

657. GAL Brantley travelled out of state to the Ms. L. Deaton's house in Maryland and personally observed the children in their home after Ms. L. Deaton, Mr. C. Wilson, Ms. R. Wilson, and Ms. E. Goldman paid her directly.

658. Judge Stephens has entered orders denying Mr. D. Deaton his right to see or speak to his counsel about evidence legally obtained through court subpoena in preparation for trial.

659. Judge Chappell refused to require Mr. S. Wyatt to produce a full set of discovery pre-trial after years of detailed delinquency notices and pleadings before her court.

**Procedural Due Process – Opportunity to be Heard.**

660. In addition to the acts alleged above, The Enterprise also deprived the Plaintiffs of an opportunity to be heard.

661. In addition, the following acts also deprived the Plaintiffs access to a fair tribunal including but not limited to:

662. Judge Chappell expressly retaliated for Ms. T. Peake's right to seek appellate review.

663. Judge Stephens eliminated Mr. D. Deaton's Christmas visitation with his children in 2021 without notice, without a hearing, and without any evidence before her court.

**Procedural Due Process – A Fair Tribunal.**

664. In addition to the acts alleged in the preceding paragraphs of Count I, The Enterprise also deprived the Plaintiffs of a fair tribunal in violation to the Due Process Clause of the Fourteen Amendment to the US Constitution.

665. In addition, the following acts also deprived the Plaintiffs access to a fair tribunal including but not limited to:

666. The Defendant Judges participation in the Enterprise.

667. The Defendant Judges receipt and provision of benefit and favors in exchange for their participation or tactic approval of the actions of the Enterprise.

668. The expressed bias on the record.

**Political Speech and Associations.**

669.   The 1st Amendment of the US Constitution guarantees citizens the right to be free from retribution from political speech and freely associate.

670.   Judge Chappell directly retaliated against Ms. T. Peake, affecting G.M.W., for Ms. T. Peake's political speech and association with her attorney's judicial campaign.

671.   Judge Chappell refused to recuse after openly campaigning with on the opposing side of Ms. T. Peake's attorney's judicial campaign.

672.   Judge Chappell hosted a campaign video on public property, during office hours, while on duty introducing the citizens of Jefferson County to her friend as the next judge.

**Freedom of the Press.**

673.   Insulating and shielding their behavior from scrutiny by sealing their courtrooms, making their case files confidential, and holding off-the-record star chamber proceedings.

674.   These judges have become so zealous in protecting their shield of secrecy that they exclude litigants and lawyers, who have every right to be before them.

675.   By example but not by way of exclusion, Judge Stephens has gone so far as to claim the official court record, as transcribed by a dually license court reporter, was incorrect and not an accurate representation of what occurred in her courtroom.

676. Judge Stephens removed a court reporter from the room to prevent a record.

677. Judge Stephens removed Ms. T. Peake's attorney from her courtroom on multiple occasions without cause.

678. **Violation of constitutional right to direct care and upbringing of children.**

679. Judge Stephens allowed GAL Brantley to direct the medical care of J.K.D., L.W.D., and R.E.D. without Mr. D. Deaton's consent and without allowing him to participate in the process of directing the care of his children.

680. Judge Chappell allowed Ms. C. Taylor, a non-attorney, to direct the medical care of G.M.W. without Ms. T. Peake's consent and without allowing her to participate in the process of directing the care of her child, even when she had final say on medical decisions pursuant to a state statue and the parent's agreement.

## Count II
## RICO
(Violation of RICO; U.S.C. § 1962(c))
(Against All Defendants)

681. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

682. Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3) who conducted the affairs of The Enterprise through the pattern of racketeering

activity detailed throughout this complaint in violation of 18 U.S.C. § 1962(c).

683. The Enterprise is an association-in-fact within the meaning of 18 U.S.C. § 1961(4), consisting of Defendants and The Enterprise participants and other medical professionals, court appointees, and state agencies that received monetary and non-monetary bribes to violate the Plaintiffs' constitutional rights and make false statements to multiple tribunals. All entities are persons within the meaning of U.S.C. § 1961(3) and acted to enable the Defendants to effectuate a conceived plan to abuse their powers of acting under the color of law, bribing, or participating in fraud under the color of law, and/or acting with co-conspirators in an individual capacity for direct monetary gain to substantially execute this financial scheme.

684. The Enterprise functioned as an ongoing organization and continuing unit. The enterprise was created and/or used as a tool to effectuate a pattern of racketeering activity. Each of these Enterprise participants, including Defendants, is a "person" distinct from The Enterprise.

685. The Defendants, in concert with other participants of The Enterprise, maintained coordinated communications with pre-determined court outcomes for the common purpose of increasing profit. Each of The Enterprise participants received substantial profit from the scheme or provided substantial bribes. Such profit was exponentially greater than it

would have been if The Enterprise would have followed the law and their ethical obligations instead of prioritizing cash, power, and influence over justice. All Enterprise participants were aware of Judge Stephens, Judge Chappell, and Judge May's involvement with The Enterprise that aided and covered up these unethical acts against the rule of law. Accordingly, each portion of The Enterprise benefited from the existence of the other parts.

686. The Defendants established The Enterprise to receive ill-gotten profits or extend bribes in exchange for violating the Plaintiffs constitutional rights.

687. The Enterprise engaged in and affected interstate commerce, because it provided false statements, directed, and further intertwined itself in at least Alabama, Maryland, and Georgia state child protective investigations.

688. The Defendants exerted control over the enterprise and have participated in the operation or management of the affairs of The Enterprise in coordination with the various Enterprise participants.

689. As detailed above, the Defendants' pattern of racketeering activity includes acts indictable as extortion under 18 U.S.C. § 1951, theft, bribery under 18 U.S.C. § 201, fraud under 18 U.S.C. § 1341, kidnapping under 18 U.S.C. § 1201, false imprisonment, witness intimidation under 18 U.S.C. § 1512, witness tampering under 18 U.S.C. § 1512, obstruction of justice under 18 U.S.C. § 1501, honest services fraud under 18 U.S.C. § 1346, criminal fraud,

mail fraud under 18 U.S.C. § 1341, wire fraud under 18 U.S.C. § 1343, violation of The Hobbs Act, and making terrorist threats.

690. Defendants' fraudulent scheme consisted of: (a) violating the Plaintiff Parent's rights to direct the care and upbringing of their children without a hearing; (b) to hold, participate in, or bribe off-the-record star chamber proceedings; (c) to actively conceal, and cause others to conceal or blatantly make false statements to superior courts to prevent appropriate judicial review; (d) intentionally misrepresenting and concealing The Enterprise participants' role in their association; (e) by ordering, directing, or participating in the destruction of documents in violation of constitutionally protected rights and in further violation of Maryland court orders.

691. In implementing their fraudulent scheme, Defendants were acutely aware that Plaintiffs depend on the honesty and integrity of the court and court officers in Jefferson County, Alabama. The Plaintiffs also rely on state and federal law obligating the Defendants and The Enterprise participants to allow Plaintiffs and all citizens access to unbiased courts.

692. At all times during the fraudulent scheme, the Defendants and The Enterprise participants had a legal and ethical obligation of candor to and honest dealing with Plaintiffs.

693. The conduct of The Enterprise described above constitutes "racketeering activity" within the meaning of 18 U.S.C. § 1961(1). The Defendants chose

to conduct its activities and transactions in such a manner that constitutes a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5).

694.    The above-described racketeering activities amounted to a common course of conduct intended to deceive and harm Plaintiffs. The Defendants knew that, if they continued the pattern and practice of misconduct including excess billings and unnecessary litigation, the Plaintiffs would attempt to pay the bill as ordered to see their children. The Defendants knew that the excess billings, unnecessary litigation, theft, bribes, and extortion would never have been made if the true facts were known. The Defendants' racketeering activities were part of ongoing business pursuits and constituted a continuing threat to the property of the Plaintiffs.

695.    The Defendants' motive in creating and operating the fraudulent scheme and The Enterprise was to obtain additional profit from excess billings, unnecessary litigation, theft, bribes, and extortion. The fraudulent scheme was designed to, and did, cause Plaintiffs to pay during the Defendants' period of misconduct and criminal activity.

696.    The Plaintiffs have been injured in their property by reason of these violations in that the Plaintiffs paid hundreds of thousands of dollars as fees to protect themselves that they would not have paid had the Defendants not engaged in this pattern of racketeering activity.

697. The injuries to Plaintiffs were directly and proximately caused by The Enterprise racketeering activity. In the absence of the Defendants' improper conduct, Plaintiffs would not have been deprived of their constitutional rights and ordered to pay fees, thereby causing economic harm in the form of unnecessary payments and out-of-pocket expenditures. These injuries include both paying for more court ordered services than would have otherwise occurred absent the RICO violations and/or paying more in legal fees than would have occurred absent the RICO violations.

698. Above all, The Enterprise participants misled and deceived the Plaintiffs and others who rely on their ethical conduct including the Plaintiffs. The Defendants deprived the Plaintiffs of discovery and legally obtained subpoenas which is needed to defend themselves. Consequently, the Defendants with the help of The Enterprise have led to Plaintiffs to pay exorbitant and fabricated "fees" that would never have been made absent the fraud.

699. Because of these violations of 18 U.S.C. § 1962(c), the Defendants are liable to Plaintiffs for three times the damages sustained, plus the costs of this suit, including reasonable attorneys' fees.

700. By reason of the foregoing, and as a direct and proximate result of the Defendants' fraudulent misrepresentations, Plaintiffs have suffered damages.

Plaintiffs are entitled to compensatory damages, equitable and declaratory relief, punitive damages, court costs, and reasonable attorneys' fees.

## Count III
### RICO CONSPIRACY
(Violation of RICO Conspiracy; U.S.C. § 1962(d))
(Against All Defendants)

701. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

702. The Enterprise knowingly and willingly coordinated actions in violation of the First, Fourth, Ninth, and Fourteenth Amendments to the United States Constitution.

703. Section 1962(d) provides that it "shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b) or (c) of this section."

704. The Defendants and the other co-conspirators violated § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c). The object of this conspiracy was to conduct or participate in, directly or indirectly, the conduct of the affairs of The Enterprise described previously through a pattern of racketeering activity. Defendants conspired with The Enterprise participants to provide or receive bribes in exchange for profits while wielding the power of the state.

705.  The Defendants and The Enterprise participants, as co-conspirators, engaged in numerous overt and predicate fraudulent racketeering acts in furtherance of the conspiracy, including material misrepresentations and omissions designed to defraud Plaintiffs of money and property.

706.  The nature of the co-conspirators' acts, material misrepresentations, and omissions in furtherance of the conspiracy gives rise to an inference that they not only agreed to the objective of an 18 U.S.C. § 1962(d) violation by conspiring to violate 18 U.S.C. § 1962(c), but they were aware that their ongoing fraudulent and extortionate acts have been and are part of an overall pattern of racketeering activity.

707.  As a direct and proximate result of Defendants' and the Enterprise's overt acts and predicate acts in furtherance of violating 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c), as described throughout this Complaint, Plaintiffs have been financially and emotionally injured.

708.  The Defendants sought to and have engaged in the commission of and continue to commit overt acts, including the following unlawful racketeering predicate acts discussed extensively herein, including but not limited to:

a.  Multiple instances of mail fraud violations 18 U.S.C. §§ 1341 and 1346;

b.  Multiple instances of wire fraud violations of 18 U.S.C. §§ 1343 and 1346;

c.  Multiple violations of The Hobbs Act; and including but not limited to the following state law claims:

d.  Multiple instances of extortion;

e.  Multiple instances of bribery;

f.  Multiple instances of fraud;

g.  Multiple instances of kidnapping;

h.  Multiple instances of witness intimidation;

i.  Multiple instances of witness tampering;

j.  Multiple instances of obstruction of justice;

k.  Multiple instances of honest services fraud;

l.  Multiple instances of theft;

m. Multiple instances of false imprisonment; and

n.  Multiple instances of criminal fraud.

709.  Because of these violations of 18 U.S.C. § 1962(d), Defendants are liable to Plaintiffs for three times the damages Plaintiffs have sustained, plus the cost of this suit, including reasonable attorney's fees.

710.  By reason of the foregoing, and as a direct and proximate result of Defendants' fraudulent misrepresentations, Plaintiffs have suffered damages. Plaintiffs are entitled to compensatory damages, equitable and declaratory relief, punitive damages, costs, and reasonable attorneys' fees.

## Count IV

## CIVIL CONSPIRACY

(Against All Defendants)

711. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

712. Defendants agreed and conspired among each other to act in concert to accomplish the wrongful acts described in detail above, and to intentionally conceal the true nature of the The Enterprise to the detriment of the Plaintiffs.

713. The Defendants had knowledge of and agreed to participate in The Enterprise and/or the acts, omissions, or commissions, expressly or by implication, which resulted in damage to the Plaintiffs as outlined in this complaint.

714. The Defendants intended that The Enterprise, their agreement, conspiracy, and concerted actions would result in the wrongful acts and harm described herein.

715. The Defendants each participated in a concerted, overt act or acts to further their conspiracy.

716. The Defendants' aim was to achieve an unlawful purpose or lawful purpose by unlawful means.

717. Each Defendant demonstrated a meeting of the minds by receiving the benefits of this conspiracy through ill-gotten, illegitimate, and impermissible transfers without conveying anything of value in exchange.

718. As a direct, proximate, and foreseeable result of the Defendants' agreement, conspiracy, and concerted actions as described herein, the Plaintiffs have and continue to be damaged.

## Count V

## ABUSE OF PROCESS

(Against All Defendants)

719. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

720. The Defendants, individually and through The Enterprise, held an ulterior purpose other than the legitimate use of legal process, namely, to illegitimately increase their own profits, and to unnecessarily and knowingly cause harm to the Plaintiffs.

721. The use of the legal process as The Enterprise, as outlined in detail herein, was a wrongful use of process.

722. In doing so, the Defendants acted consciously and maliciously of the harm their wrongful use would cause.

723. The Defendants' actions in abusing the legal process for an unlawful purpose did in fact cause harm to the Plaintiffs, including by not limited to, unnecessary attorney fees, cost of court, lost wages, and mental and emotional damage among others.

## Count VI

## FRAUD

(Against All Defendants)

724. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

725. The Defendants, jointly and severely, independently and on behalf of The Enterprise, engaged in a concerted effort to make knowingly false statements, misrepresent the true facts, and conceal the facts, as outlined in detail throughout this complaint.

726. The nature and actions described in detail in this complaint required the Defendants to participate in fraud to effectuate the actions of The Enterprise.

727. By accepting or extending bribes or concealing the true nature of this arrangement, the Defendants knew or should have known that the concealment of those facts resulted in false or misleading statements which would be relied upon by others.

728.  The statements were made with intent to deceive and cover up the acts, and very existence, of The Enterprise.

729.  Those false statements, concealment of true facts, and misrepresentation of facts were done in such a way as to cause a false or inaccurate impression of the true facts. Such statements were made knowing or intentionally of the falsehood, concealment, or misrepresentation.

730.  Those false statements, misrepresentations, and concealment of true facts were reasonably relied upon by others.

731.  The Plaintiffs actually and proximately suffered damages as a result of these false statements, material misrepresentations, and concealment of true facts.

## Count VII

## UNJUST ENRICHMENT

(All Plaintiffs v. GAL Brantley, GAL Wess, Hardy Law Firm, and Wess Law Firm)

732.  Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

733.  GAL Brantley, GAL Wess, Hardy Law Firm, and Wess Law Firm engaged in a pattern and practice of unsubstantiated and unreasonable billing for their service as guardians ad litem.

734. GAL Brantley, GAL Wess, Hardy Law Firm, and Wess Law Firm manufactured fees for no legitimate purpose except to increase their own fee claim.

735. GAL Brantley, GAL Wess, Hardy Law Firm, and Wess Law Firm exchanged in these unethical and illegal acts, including but not limited to the following by way of examples:

736. GAL Wess charging to accommodate an exotic dancer or adult entertainer at her out-of-state home.

737. GAL Brantley signed an agreement of the parents and, for no legitimate purpose, objected to the agreement to increase her fees for approximately two years.

738. GAL Wess acted as legal counsel for Ms. C. Wyatt and Mr. G. Wyatt after accepting their bribe but then also billed Ms. T. Peake and Mr. S. Wyatt for the same time and services.

739. GAL Brantley appeared in open court before Judge Stephens to request fees for her daughter, JA Brantley, and then billed Mr. D. Deaton and Ms. L. Deaton for the same time and services. When directed asked to withdraw for this clear conflict, GAL Brantley refused and marched forward billing tens of thousands of dollars in the months following.

740. GAL Brantley, GAL Wess, Hardy Law Firm, and Wess Law Firm knowingly represented improper, unearned, and manufactured fees as their true and

legitimate fees earned in the respective cases with fellow participants from The Enterprise.

741.  As a direct and proximate result, GAL Brantley, GAL Wess, Hardy Law Firm, and Wess Law Firm are each in possession of money, which in equity and good conscience, is unearned, does not belong to them, and due to be refunded to the Plaintiffs.

742.  The funds paid by the Plaintiffs, which is currently in the possession, custody, or control of GAL Brantley, GAL Wess, Hardy Law Firm, and Wess Law Firm, were paid under protest, out of fear of retribution, and under duress.

## Count VIII

## FALSE IMPRISONMENT

(Ala. Code § 6-5-170)

(L.W.D. and R.E.D. v. GAL Brantley and Hardy Law Firm)

743.  Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

744.  GAL Brantley falsely imprisoned and created the unlawful detention of L.W.D. and R.E.D.

745.   On or about October 2019, GAL Brantley intentionally confined them to her car and transported L.W.D., and R.E.D. using the authority of her position to say it would not be delayed and would not be optional.

746.   GAL Brantley's confinements caused all members of the Plaintiffs to suffer emotional distress, financial loss, and time away from one another that can never be recovered.

747.   The Plaintiffs are entitled to relief, including damages, injunctive relief, and attorneys' fees.

## Count IX

## FALSE IMPRISONMENT

(Ala. Code § 6-5-170)

(J.K.D., L.W.D., and R.E.D. v. GAL Brantley, Attorney Duncan, Judge Stephens, Hardy Law Firm, and Kirk.Drennan)

748.   Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

749.   GAL Brantley, Attorney Duncan, and Judge Stephens confined J.K.D., L.W.D., and R.E.D.

750. On or about June 29, 2022, GAL Brantley, Duncan, and Judge Stephens confined J.K.D., L.W.D. and R.E.D. without legal authority or consent from Mr. D. Deaton.

751. Defendant's confinements caused all members of the Plaintiffs to suffer emotional distress, financial loss, and time away from one another that can never be recovered.

752. The Plaintiffs are entitled to relief, including damages, injunctive relief, and attorneys' fees.

## Count X

## FALSE IMPRISONMENT

(Ala. Code § 6-5-170)

(G.M.W. v. Attorney Gregory and Crittenden Partners)

753. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

754. Attorney Gregory falsely imprisoned and created the unlawful detention of G.M.W.

755. On June 21, 2020, Attorney Gregory confined and transported G.M.W. without legal authority or consent from Ms. T. Peake.

756. Defendant's confinements caused all members of the Plaintiffs to suffer emotional distress, financial loss, and time away from one another that can never be recovered.

757. The Plaintiffs are entitled to relief, including damages, injunctive relief, and attorneys' fees.


## Count XI

## FALSE IMPRISONMENT

(Ala. Code § 6-5-170)

(J.K.D. and L.W.D. v. Attorney Drennan and Kirk.Drennan)

758. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

759. Attorney Drennan falsely imprisoned and created the unlawful detention of J.K.D. and L.W.D.

760. On August 27, 2019, Attorney Drennan confined and transported J.K.D. and L.W.D. without legal authority or consent from Mr. D. Deaton.

761. Attorney Drennan's confinements caused all members of the Plaintiffs to suffer emotional distress, financial loss, and time away from one another that can never be recovered.

762.   The Plaintiffs are entitled to relief, including damages, injunctive relief, and attorneys' fees.

## Count XII

## FALSE IMPRISONMENT

(Ala. Code § 6-5-170)

(Ms. T. Peake and G.M.W. v. Ms. C. Taylor, Caroline O. Taylor, Attorney Fann, and Judge Chappell)

763.   Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

764.   Ms. C. Taylor falsely imprisoned and created the unlawful detention of G.M.W. and Ms. T. Peake.

765.   On or around December 20-22, 2019, Ms. C. Taylor made multiple false statements that resulted in G.M.W.'s motions being restricted during Ms. T. Peake's holiday custodial time directly due to her statements.

766.   Ms. C. Taylor alleged that she sent her concerns to Judge Chappell. If true, the statements were sent to Judge Chappell *ex parte* as there is no record of those statements with the court.

767. These confinements caused Ms. T. Peake to be unable to enter her home if G.M.W. was present and for G.M.W. to be unable to interact with his siblings without restrictions.

768. Ms. C. Taylor further demanded and directed under color state of law that G.M.W.'s passport be turned over to prevent him from traveling.

769. The actions, instructions, and directives of Ms. C. Taylor, in her own words, were to have the same effect as judge's orders, due to Attorney Fann and Judge Chappell's delegation of duties to a non-attorney.

770. Attorney Fann and Judge Chappell delegated these authorities and the power of the state to Ms. C. Taylor illegally and then failed to supervise her actions.

771. The Plaintiffs to suffer emotional distress, financial loss, and time away from one another that can never be recovered.

772. The Plaintiffs are entitled to relief, including damages, injunctive relief, and attorneys' fees.

## Count XIII

## INVASION OF PRIVACY

(Ms. T. Peake and G.M.W. v. Attorney Drennan, Attorney Duncan, and

Kirk.Drennan)

773.   Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

774.   On or about September 2018, Attorney Drennan and Attorney Duncan intruded upon the Plaintiff's physical solitude by directing videotaping and spying through a window of their home without their consent. After obtaining video of G.M.W., a minor child, through the window of his home, Attorney Drennan and Attorney Duncan refused to turn over video of the minor to his parents after multiple requests.

775.   The invasion of Ms. T. Peake and G.M.W.'s privacy was intentional and without consent.

776.   The invasion of Ms. T. Peake and G.M.W.'s privacy was highly offensive to a reasonable person.

777.   As a direct and proximate result of the invasion of privacy, Ms. T. Peake and G.M.W. has suffered damages, including but not limited to: mental anguish, emotional distress, loss of privacy, and financial loss.

## Count XIV

## INVASION OF PRIVACY

(Ms. T. Peake v. Attorney Yarbrough, Attorney Gregory, and Attorney Montgomery Lee, Attorney Crittenden, Crittenden Partners, and Judge Chappell)

778.   Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

779.   On or about August 2022, Attorney Yarbrough, Attorney Gregory removed or caused to be removed Ms. T. Peake's psychological evaluation from Judge Chappel's chambers.

780.   Ms. T. Peake volunteered to sit for a psychological evaluation. An order from Judge Chappell stated the psychological evaluation would be kept under seal in her chambers.

781.   On or around November 2022, Judge Chappell admitted on the record of the trial that the psychological evaluation of Ms. T. Peake should not have been removed from her office.

782.   Attorney Yarbrough and Attorney Gregory admitted on the record that they removed the psychological evaluation from under seal allegedly with the permission of Judge Chappell's staff.

783.    After removing the psychological evaluation from Judge Chappell's chambers, Attorney Yarbrough and Attorney Gregory shared the psychological evaluation with multiple attorneys including an attorney that expressly represented that he did not represent Mr. S. Wyatt or Ms. T. Peake on any custodial matters.

784.    The invasion of Ms. T. Peake's privacy was intentional and without consent.

785.    The invasion of Ms. T. Peake's privacy is highly offensive to a reasonable person.

786.    As a direct and proximate result of the invasion of privacy, Ms. T. Peake has suffered damages, including but not limited to: mental anguish, emotional distress, loss of privacy, and financial loss.

## Count XV

## INVASION OF PRIVACY

(Mr. D. Deaton and J.K.D. v. Ms. D. Maynard and Hope for Healing)

787.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

788.    On February 1, 2023, Ms. D. Maynard shares confidential information from J.K.D.'s private counseling sessions.

789.   On March 20, 2023 Mr. D. Deaton states that "I do not agree and have never agreed for you to discuss this with third parties.  I do not understand why you are copying an attorney in Alabama while refusing to speak with mine." And on March 21, 2023, "I do not think it is appropriate to share information about directing [J.K.D.]'s care with any third party."

790.   Even after Mr. D. Deaton requests Ms. D. Maynard to cease sharing confidential information, Ms. D. Maynard states "I am required to send all information to [J.K.D.]'s Ad Litem, CH Brantley." And "I do speak with [J.K.D.]'s ad litem, from time to time, when there is a need for an update, that I deem important, in advocating for [J.K.D.]'s well being.  This is under my discretion."

791.   The invasion of J.K.D.'s privacy was intentional and without consent.

792.   The invasion of J.K.D.'s privacy was highly offensive to a reasonable person.

793.   As a direct and proximate result of the invasion of privacy, J.K.D. and Mr. D. Deaton has suffered damages, including but not limited to: mental anguish, emotional distress, loss of privacy, and financial loss.

## Count XVI

## INVASION OF PRIVACY

(J.K.D., L.W.D., and R.E.D. v. Ms. C. Taylor and Caroline O. Taylor)

794.   Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

795.   On or around December 22, 2019, Ms. C. Taylor made claims about what she alleged to know was happening in Ms. L. Deaton's household in Maryland in a case in which she was not involved or assigned to in any capacity.

796.   Ms. C Taylor's claims about what she alleged was happening in Ms. L. Deaton's household extended to one of her neighbors and included demands that the neighbor supervise activities when the girls were present.

797.   The invasion of J.K.D., L.W.D., and R.E.D.'s privacy was intentional and without consent.

798.   The invasion of J.K.D., L.W.D., and R.E.D.'s privacy was highly offensive to a reasonable person.

799.   As a direct and proximate result of the invasion of privacy, J.K.D., L.W.D., R.E.D. and Mr. D. Deaton have suffered damages, including but not limited to: mental anguish, emotional distress, loss of privacy, and financial loss.

**Count XVII**

**ALABAMA LITIGATION ACCOUNTABILITY ACT**

(Ala. Code § 12-19-272)

(Mr. D. Deaton, J.K.D., L.W.D., and R.E.D. v. Attorney Drennan, Attorney

Duncan, and Kirk.Drennan)

800.   Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

801.   On or about December 2022 and again in May 2023, the Defendant violated the Alabama Litigation Act by continuing to pursue a custody claim with full knowledge that discovery and sworn statements from both parties acknowledge that there were no changes in circumstances to justify a custody modification.

802.   The custody claim pursued by Attorney Drennan, Attorney Duncan, and Kirk.Drennan was frivolous and unsupported by fact or the law.

803.   In fact, Attorney Drennan represented to the court that Kirk.Drennan was not seeking a custodial change on Ms. L. Deaton's behalf and therefore her mental health discovery records should not be at issue, while actively seeking a custody claim for full legal and full physical custody.

804. After the above representation, Attorney Duncan was directly asked to withdraw the claim within the last month.

805. (1)After making representations to Judge Stephens that Kirk.Drennan was not seeking a custodial change on Ms. L. Deaton's behalf, (2) after being present at their client, Ms. L. Deaton's, May 5, 2023 deposition wherein it was evident there was no change in circumstance in which to bring a claim, and (3) after being asked directly to withdraw the claim, Attorney Drennan and Attorney Duncan still refused to amend or withdraw a claim that served no legitimate purpose except to increase their profits and harass the Plaintiffs.

806. Attorney Drennan and Attorney Duncan's violation of the Alabama Litigation Act was, and continues to be, intentional.

807. As a direct and proximate result of Attorney Drennan, Attorney Duncan, and Kirk.Drennan's violation of the Alabama Litigation Act, the Plaintiffs have suffered damages, including but not limited to, financial loss, emotional distress, and the loss of precious time in their lives, which they will never be able recover.

## Count XVIII

## ALABAMA LITIGATION ACCOUNTABILITY ACT

(Ala. Code § 12-19-272)

(Ms. T. Peake and G.M.W. v. Attorney Yarbrough, Attorney Gregory, Attorney Crittenden, Attorney Montgomery Lee, Crittenden Partners, Attorney Lee, Attorney McKnight, Jr., Attorney Clark, Wallace Jordan)

808.   Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

809.   Attorney Yarbrough, Attorney Gregory, Attorney Crittenden, Attorney Montgomery Lee, Crittenden Partners, Attorney Lee, Attorney McKnight, Jr., Attorney Clark, and Wallace Jordan pursued litigation they knew to be groundless in law and in fact.

810.   Attorney Yarbrough, Attorney Gregory, Attorney Crittenden, Attorney Montgomery Lee, Crittenden Partners, Attorney Lee, Attorney McKnight, Jr., Attorney Clark, Wallace Jordan pursued and billed for emergency litigation as to where G.M.W. should attend school, after both parents toured the school, submitted an application fee to hold the child's spot, and while Ms. T. Peake held final say pursuant to an Alabama state statue on decision making for G.M.W.

811. Attorney Yarbrough, Attorney Gregory, Attorney Crittenden, Attorney Montgomery Lee, Crittenden Partners, Attorney Lee, Attorney McKnight, Jr., Attorney Clark, Wallace Jordan asked for Ms. T. Peake to be jailed by Judge Chappell for selecting her child's school after touring it with her co-parent, Mr. S. Wyatt, and after Mr. S. Wyatt paid the application fee.

812. Mr. S. Wyatt did not oppose and still does not oppose G.M.W. attending his current school.

813. These Defendant attorneys, as members of the Enterprise with Judge Chappell, prosecuted emergency motions and motions for contempt against Ms. T. Peake even though there was no true dispute.

814. It was frivolous, groundless, and interposed for delay to substantially increase litigation for their own profits. Despite these Defendant attorneys advancing this school issue for years that caused hundreds of thousands in damages to the Plaintiffs, Mr. S. Wyatt's sworn testimony at trial did not support their allegations. This still resulted in Judge Chappell awarding those alleged fees against Ms. T. Peake due to her associate with The Enterprise.

815. To this date, G.M.W. remains enrolled in the same school as he was when they raised these issues.

816. As a direct and proximate result of Attorney Yarbrough, Attorney Gregory, Attorney Crittenden, Attorney Montgomery Lee, Crittenden Partners,

Attorney Lee, Attorney McKnight, Jr., Attorney Clark, Wallace Jordan's violation of the Alabama Litigation Act, the Plaintiffs have suffered damages, including but not limited to, financial loss, emotional distress, and the loss of precious time in their lives, which they will never be able recover.

## Count XIX

## ALABAMA LITIGATION ACCOUNTABILITY ACT

(Ala. Code § 12-19-272)

(Ms. T. Peake and G.M.W. v. GAL Wess and Wess Law Firm)

817.   Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

818.   On March 14, 2023, Ms. T. Peake and Mr. S. Wyatt agreed for GAL Wess to be removed.

819.   Judge May directed GAL Wess' removal from the bench, and GAL Wess acknowledged he has been dismissed from the case.

820.   After being dismissed from the case, GAL Wess continued to litigate the case in a superior court without any authorization or reason.

821.   GAL Wess and Wess Law Firm, purporting to bring a pleading on behalf of G.M.W., asked the Alabama Court of Civil Appeals to dismiss Ms. T. Peake's appeal.

822. GAL Wess knew or should have now his pleading had no basis in law or fact.

823. GAL Wess knew and stated he knew he had been dismissed from the case.

824. Not for any legitimate purpose, but only to increase his profits, GAL Wess and Wess Law Firm interfered and pursued further litigation in the Alabama Court of Civil Appeals against Ms. T. Peake in her post-divorce custodial case.

825. As a direct and proximate result of GAL Wess and Wess Law Firm's violation of the Alabama Litigation Act, the Plaintiffs have suffered damages, including but not limited to, financial loss, emotional distress, and the loss of precious time in their lives, which they will never be able recover.

## Count XX

## ALABAMA LITIGATION ACCOUNTABILITY ACT

(Ala. Code § 12-19-272)

(Mr. D. Deaton, J.K.D., L.W.D., and R.E.D. v. GAL Brantley and Hardy Law Firm)

826. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

827. GAL Brantley signed an agreement of the parents and, for no legitimate purpose, objected to the agreement to increase her fees for approximately two years.

828. GAL Brantley knew in 2019 that her objection and continual litigation served no legitimate purpose except to expand her fees and harass the Plaintiffs, including her clients, the minor children.

829. In 2021, GAL Brantley appeared in open court before Judge Stephens to request fees for her daughter, JA Brantley, and then billed Mr. D. Deaton and Ms. L. Deaton for the same time and services.

830. GAL Brantley knew or should have known she could not pursue litigation on her daughter's (JA Brantley) behalf while billing Mr. D. Deaton and Ms. L. Deaton for an illegitimate and unauthorized dual representation.

831. When directly asked to withdraw for this clear conflict by an attorney, GAL Brantley refused and marched forward billing tens of thousands of dollars in the months following.

832. As a direct and proximate result of GAL Brantley and Hardy Law Firm's violation of the Alabama Litigation Act, the Plaintiffs have suffered damages, including but not limited to, financial loss, emotional distress, and the loss of precious time in their lives, which they will never be able recover.

## Count XXI

## DEFAMATION

(Ala Code 6-5-180 - 189)

(Mr. D. Deaton, v. Attorney Drennan and Kirk.Drennan)

833. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

834. The defamatory statements made, and harm delivered by Attorney Drennan and Kirk.Drennan are numerous and continuing in nature.

835. By way of example but not exclusion, Attorney Drennan has stated, "Mr. Deaton has historically interfered with the girls' mental health care which is why she was awarded such authority."

836. At all times relevant, Attorney Drennan knew her statement was false.

837. Attorney Drennan was put on notice of her false statement in pleadings and still refused to correct her defamatory remark.

838. Attorney Drennan's defamatory statements created harm to Mr. D. Deaton's reputation and directly caused damage to prevent an appointment he scheduled.

839.   The statements were unprivileged communication of false and defamatory material to a third party separate, apart, and unnecessary from the litigation process.

840.   As a direct and proximate result of Attorney Drennan and Kirk.Drennan's defamatory statements, the Plaintiffs have suffered damages, including but not limited to, financial loss, emotional distress, and the loss of precious time in their lives, which they will never be able recover.

## Count XXII

## DEFAMATION

(Ala Code 6-5-180 - 189)

(Ms. T. Peake v. Attorney Gregory, Attorney Yarbrough, and Crittenden Partners)

841.   Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

842.   Attorney Gregory, Attorney Yarbrough, and Crittenden Partners knowingly made defamatory statements about Ms. T. Peake.

843.   By way of example but not exclusion, Attorney Gregory met with GAL Brantley to share defamatory information with a GAL in a different case after also receiving money from Ms. L. Deaton.

844.  By way of example but not exclusion, Attorney Yarbrough made defamatory remarks about Ms. T. Peake and directed her staff not to allow Ms. T. Peake to set a conference call on her schedule at any time, while Ms. T. Peake was pro se, to prevent facilitating settlement discussions.

845.  Attorney Gregory and Attorney Yarbrough's defamatory statements created harm to Mr. T. Peake's reputation and directly caused damage to prevent the facilitation of settlement offers and to cause information from Ms. T. Peake's case to appear in other cases with false statements.

846.  The statements were unprivileged communication of false and defamatory material to a third party separate, apart, and unnecessary from the litigation process.

847.  As a direct and proximate result of Attorney Gregory, Attorney Yarbrough, and Crittenden Partners' defamatory statements, the Plaintiffs have suffered damages, including but not limited to, financial loss, emotional distress, and the loss of precious time in their lives, which they will never be able recover.

## Count XXIII

## DEFAMATION

(Ala Code 6-5-180 - 189)

(J.K.D., L.W.D., R.E.D. v. Ms. C. Taylor and Caroline O. Taylor)

848.   Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

849.   Ms. C. Taylor knowingly made defamatory statements about three minor children, J.K.D., L.W.D., and R.E.D.

850.   By way of example but not exclusion, on or around December 22, 2019, Ms. C. Taylor made defamatory statements about J.K.D., L.W.D., and R.E.D., alleging that they were unfit to be around G.M.W.

851.   Ms. C. Taylor made these defamatory statements about J.K.D., L.W.D., and R.E.D. to multiple third parties including attorneys and one of her neighbors.

852.   Ms. C. Taylor defamatory statements created harm to J.K.D., L.W.D., and R.E.D. reputation, including but not limited to their ability to make friends with neighbors after these defamatory statements in their neighborhood.

853.   The statements were unprivileged communication of false and defamatory material to a third party separate, apart, and unnecessary from the litigation process.

854.   As a direct and proximate result of Ms. C. Taylor's defamatory statements, the Plaintiffs have suffered damages, including but not limited to, financial loss, emotional distress, and the loss of precious time in their lives, which they will never be able recover.

## Count XXIV

### MALICIOUS PROSECUTION

(Ms. T. Peake v. Ms. C. Taylor and Caroline O. Taylor)

855.   Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

856.   On or around November 2022, Ms. C. Taylor pursued a complaint against Ms. T. Peake asking Judge Chappell to order Ms. T. Peake to pay unsubstantiated fees and costs allegedly incurred by Ms. C. Taylor.

857.   Ms. C. Taylor acted without probable cause and with malice.

858.   Ms. C. Taylor raised this claim for the purpose of harassing Ms. T. Peake and G.M.W. and in an attempt to improperly further line their pockets and increase their profits.

859. The prior proceeding ended in favor of Ms. T. Peake when Attorney John Dana withdrew the claim after his client, Ms. C. Taylor, refused to testify in support of her own claim.

860. Approximately one month prior, Ms. C. Taylor testified at Ms. T. Peake's trial as a bought-and-paid fact witness against well-established law.

861. As a direct and proximate result of Ms. C. Taylor and Caroline O. Taylor's violation of the Alabama Litigation Act, the Plaintiffs have suffered damages, including but not limited to, financial loss, emotional distress, and the loss of precious time in their lives, which they will never be able recover.

## Count XXV

## LEGAL MALPRACTICE

(Ala. Code § 6-5-572)

(J.K.D., L.W.D., and R.E.D. v. GAL Brantley and Hardy Law Firm)

862. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

863. GAL Brantley is an attorney licensed to practice law in the State of Alabama.

864. On or about August 2019 and again in November 2021, GAL Brantley accepted the representation Plaintiffs J.K.D., L.W.D., and R.E.D. in a legal matter, including over Mr. D. Deaton's objection.

865. GAL Brantley failed to exercise the reasonable care and skill expected of an attorney in the same or similar circumstances.

866. By way of example but not exclusion, GAL Brantley signed an agreement of the parents and, for no legitimate purpose, objected to the agreement to increase her fees for approximately two years.

867. Both Ms. L. Deaton and Mr. D. Deaton agree this period of delay caused harm to the minor children, J.K.D., L.W.D., and R.E.D.

868. As a direct and proximate result of GAL Brantley's negligence, the Plaintiffs have suffered damages, including but not limited to: economic damages such as attorney's fees, lost wages and medical expenses; and non-economic damages, such as pain and suffering and emotional distress.

## **Count XXVI**

## **LEGAL MALPRACTICE**

(Ala. Code § 6-5-572)

(G.M.W. v. GAL Wess and Wess Law Firm)

869.   Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

870.   GAL Wess is an attorney licensed to practice law in the State of Alabama.

871.   On or about October 2019, GAL Wess and Wess Law Firm accepted the representation G.M.W. in a legal matter, including over Ms. T. Peake's objections thereafter.

872.   GAL Wess failed to exercise the reasonable care and skill expected of an attorney in the same or similar circumstances.

873.   By way of example but not exclusion, GAL Wess charged to accommodate an exotic dancer or adult entertainer at her out-of-state home.

874.   By way of example but not exclusion, GAL Wess acted as legal counsel for Ms. C. Wyatt and Mr. G. Wyatt after accepting their bribe but then also billed Ms. T. Peake and Mr. S. Wyatt for the same time and services.

875.   As a direct and proximate result of GAL Wess' negligence, the Plaintiffs have suffered damages, including but not limited to: economic damages such as attorney's fees, lost wages and medical expenses; and non-economic damages, such as pain and suffering and emotional distress.

## Count XXVII

## LEGAL MALPRACTICE

(Ala. Code § 6-5-572)

(Mr. D. Deaton, J.K.D., L.W.D., and R.E.D. v. Attorney Davidson)

876.  The Defendant is an attorney licensed to practice law in the State of Alabama.

877.  It is well known within the Birmingham legal community that Attorney Davidson suffers from substance abuse disorder and became known to Mr. D. Deaton only after Attorney Davidson became involved in his case and directed the actions of his children separate, apart, and unnecessary to the litigation process and without authority to direct the actions she purported to require.

878.  Attorney Davidson was impaired to the extent that she could not render the services she accepted.

879.  The Defendant failed to exercise the reasonable care and skill expected of an attorney in the same or similar circumstances.

880.  As a direct and proximate result of the Attorney Davidson's breach of the standard of care, Mr. D. Deaton, J.K.D, L.W.D., and R.E.D. have suffered damages, including but not limited to an increase in unnecessary legal fees, court costs, lost wages, and mental or emotional distress.

**Count XXVIII**

## LEGAL MALPRACTICE

(Ala. Code § 6-5-572)

(Ms. T. Peake and G.M.W. v. Attorney Fann)

881. The Defendant is an attorney licensed to practice law in the State of Alabama.

882. On or about September 2019, Attorney Fann agreed to serve as Special Master over Ms. T. Peake and Mr. S. Wyatt's case.

883. Attorney Fann failed to exercise the reasonable care and skill expected of an attorney in the same or similar circumstances.

884. Attorney Fann recommended and successfully delegated judicial duties to a non-attorney and her friend, Ms. C. Taylor.

885. As a direct and proximate result of the Attorney Fann's negligence, the Plaintiff has suffered damages, including but not limited to: economic damages such as attorney's fees, lost wages and medical expenses; and non-economic damages, such as pain and suffering and emotional distress.

## Count XXIX

## LEGAL MALPRACTICE

(Ala. Code § 6-5-572)

(Ms. T. Peake and G.M.W. v. Attorney Montgomery Lee, Attorney Crittenden,

Attorney Gregory, Attorney Yarbrough, and Crittenden Partners)

886. Attorney Montgomery Lee, Attorney Crittenden, Attorney Gregory, and Attorney Yarbrough are attorneys licensed to practice law in the State of Alabama.

887. On or around March 2018, Ms. T. Peake consulted with Attorney Montgomery Lee regarding her anticipated divorce, including to discuss jointly owned business and business interests.

888. In this consultation, Ms. T. Peake shared confidential and privileged information regarding her divorce, custody concerns, and concerns surrounding the jointly owned businesses.

889. Following this consultation and the divorce of Ms. T. Peake and Mr. S.Wyatt, Ms. T. Peake filed a post divorce custodial case.

890. Crittenden Partners appeared as legal counsel for Mr. S. Wyatt on or around August 2019.

891. The standard of care required Attorney Montgomery Lee to keep the information learned in confidence, to not use it against me in any future engagement, and to not take a position materially adverse to me related to these facts.

892. Attorney Montgomery Lee, Attorney Crittenden, Attorney Gregory, Attorney Yarbrough, and Crittenden Partners breached the standard of care a) by sharing the information learned in confidence, b) by using the information divulged in confidence against Ms. T. Peake in a future representation of Mr. S. Wyatt, and c) taking a position materially adverse to Ms. T. Peake which arose from the same or substantially similar as discussed in the consultation.

893. Each of those breaches were in violation of the Alabama Rules of Professional Conduct governing attorneys and were in violation of the relevant standard of care.

894. But for their possession of the information gained in confidence, Mr. S. Wyatt would not have been able to prevail against Ms. T. Peake in their post divorce litigation.

895. In fact, Mr. S. Wyatt alleged that no other attorney in Alabama could possibly represent him except for the defendants (Crittenden Partners) and further litigated to keep them in the case. They remain involved in the post divorce litigation as of the time of this filing.

896. As a direct and proximate result, Judge Chappell, entered an ordered against Ms. T. Peake, causing damages including by not limited to: attorney fees, costs of court, lost wages, and mental and emotional distress.


**Count XXX**

## MALPRACTICE

(Ala. Code § 6-5-548)

(Ms. T. Peake and G.M.W. v. Ms. C. Taylor and Caroline O. Taylor)

897.  Ms. C. Taylor is a licensed medical provider practicing in the State of Alabama.

898.  Ms. C. Taylor directed the medical care of Ms. T. Peake and G.M.W., not for the purpose of diagnosis or any medical treatment, but solely for use in litigation.

899.  By way of example but not exclusion, Ms. C. Taylor breached the duty of care and then withheld G.M.W.'s file, including invoices, for no legitimate purpose and at all times relevant prior to filing refused to produce G.M.W.'s file.

900.  As a direct and proximate result of Ms. C. Taylor and Caroline O. Taylor P.C.'s negligence, the Plaintiff has suffered damages, including but not limited to: economic damages, such as lost wages and medical expenses; non-economic damages, such as pain and suffering and emotional distress

## Count XXXI

## MALPRACTICE

(Ala. Code § 6-5-548)

(Mr. D. Deaton v. Dr. Blotcky and Alan D. Blotcky, Ph.D., LLC)

901.   The Defendant is a licensed medical provider practicing in the State of Alabama.

902.   Dr. Blotcky is a licensed medical provider practicing in the State of Alabama.

903.   Dr. Blotcky and Alan D. Blotcky, Ph.D., LLC directed the medical care of Ms. T. Peake and G.M.W., not for the purpose of diagnosis or any medical treatment, but solely for use in litigation.

904.   By way of example but not exclusion, Dr. Blotcky breached that duty of care by practicing in the state of Maryland without a license, failing to follow APA protocol in his service to the court against a court order, and refusing to acknowledge or correct omissions or errors in his report.

905.   As a direct and proximate result of Dr. Blotcky and Alan D. Blotcky, Ph.D., LLC's negligence, the Plaintiff has suffered damages, including but not limited to: economic damages such as attorney's fees, lost wages and medical expenses; and non-economic damages, such as pain and suffering and emotional distress.

# **PRAYER FOR RELIEF**

906.  The Plaintiffs do not seek reversal of state court orders.

907.  The Plaintiffs seek access to a proper and unbiased court to hear these issues

affecting minor children on their merits and further seek the following relief:

WHEREFORE, Plaintiffs prays for judgment as follows:

A.      An order declaring that all Defendants' acts or omissions, described herein,

violated the First, Fourth, Ninth, and Fourteenth Amendments to the United States

Constitution;

B.      Compensatory damages against all Defendants jointly and severally in their

individual capacity in an amount to be determined at trial;

C.      Punitive damages against all Defendants in their individual capacity in an

amount to be determined at trial;

D.      Reasonable costs and attorneys' fees, including fees in accordance with 42

U.S.C. § 1988 and any other applicable law;

E.      Pre- and post-judgment interest as allowed by law;

F.      Treble damages against all Defendants in The Enterprise;

G.      That all Defendants be disgorged of all ill-gotten gains, including by not limited to, wages, bribes, kickbacks, salaries, fees, and any other monetary or non-monetary gain as a result of The Enterprise;

H.      Any other relief this Court deems just and proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

Respectfully submitted this 2nd day of June, 2023.


/s/ Scott Tindle

Scott Tindle (State Bar No. 0698T79T)
Tindle Firm
Telephone: 251-202-9437
scott@tindlefirm.com

**Defendants to be served as follows:**

**(By US Marshall)**

Jessica Kirk Drennan
500 Office Park Dr Ste 100
Mountain Brk, AL 35223-2444

**(By private process server)**

Patricia Stephens
2124 7th Ave N Ste 210
Birmingham, AL 35203-2729

Agnes Chappell
2124 7th Ave N Ste 230
Birmingham, AL 35203-2729

Alicia May Ruffin
2124 7th Ave N Ste 240
Birmingham, AL 35203-2729

Amanda Duncan
201 Office Park Dr Ste 320
Mountain Brk, AL 35223-2424

Clotele Brantley
2885 Acton Rd Apt J
Birmingham, AL 35243

Everett Wess
1900 Crestwood Blvd Ste 110
Irondale, AL 35210-2056

Paige Yarbrough
1 Independence Plz Ste 305
Birmingham, AL 35209-2658

Deborah Gregory
1 Independence Plz Ste 305

Birmingham, AL 35209-2658

Laura Montgomery Lee
1 Independence Plz Ste 305
Birmingham, AL 35209-2658

Judith Crittenden
1 Independence Plz Ste 305
Birmingham, AL 35209-2658

Gary Lee
800 Shades Creek Parkway, Suite 400
Birmingham, AL 35209

Thomas McKnight Jr.
800 Shades Creek Parkway, Suite 400
Birmingham, AL 35209

Jay Clark
800 Shades Creek Parkway, Suite 400
Birmingham, AL 35209

Deegan Malone
2721 Jenny Ln
Vestavia Hills AL 35243

Alan Blotcky
529 Beacon Pkwy W #107,
Birmingham, AL 35209

Wendy Crew
2001 Park Pl Ste 550
Birmingham, AL 35203-2714

Christina Vineyard
2001 Park Pl Ste 550
Birmingham, AL 35203-2714

Marcus Jones
300 Arrington Blvd N Ste 200

Birmingham, AL 35203-3357

Madison Brantley
2885 Acton Rd Apt J
Birmingham, AL 35243

Carolyn Wyatt
1945 Indian Lake Dr.
Birmingham, AL 35244

Gary Wyatt
1945 Indian Lake Dr.
Birmingham, AL 35244

Robert Eric Mashburn
3840 Ridgeway Dr,
Birmingham, AL 35209

Caroline Taylor
1502 Roseland Dr
Birmingham, AL 35209

Kim Davidson
400 Vestavia Pkwy Ste 100
Vestavia, AL 35216-3750

Heather Fann
201 Office Park Dr Ste 320
Mountain Brk, AL 35223-2424

**(By certified mail by clerk's office)**

Kim Davidson Law Office LLC
400 Vestavia Pkwy Ste 100
Vestavia, AL 35216-3750

Caroline O. Taylor P.C.
1502 Roseland Dr
Birmingham, AL 35209

Crew Gentle Law P.C.
2001 Park Pl Ste 550
Birmingham, AL 35203-2714

Crew Law Group
2001 Park Pl Ste 550
Birmingham, AL 35203-2714

Wallace Jordan Ratliff & Brandt L.L.C.
800 Shades Creek Parkway, Suite 400
Birmingham, AL 35209

The Crittenden Firm P.C.
1 Independence Plz Ste 305
Birmingham, AL 35209-2658

Kirk.Drennan P.C.
500 Office Park Dr Ste 100
Mountain Brk, AL 35223-2444

The Hardy Law Firm LLC
2885 Acton Rd Apt J
Birmingham, AL 35243

The Wess Law Firm P.C.
1900 Crestwood Blvd Ste 110
Irondale, AL 35210-2056

Alan D.Blotcky Ph.D. LLC
529 Beacon Pkwy W #107,
Birmingham, AL 35209

Renee Wilson
153 Sansbury Rd.
Friendship, MD 20758

Compton Wilson
153 Sansbury Rd.
Friendship, MD 20758

Southern Maryland Dredging Inc.
153 Sansbury Rd.
Friendship, MD 20758

Erika Goldman
153 Sansbury Rd.
Friendship, MD 20758

Michael Labellarte
130 Admiral Cochrane Dr,
Annapolis, MD 21401

CPE Clinic LLC
130 Admiral Cochrane Dr,
Annapolis, MD 21401

Dale Maynard
1831 Forest Drive, Suite F,
Annapolis, MD 21401

Hope For Healing LLC
1831 Forest Drive, Suite F,
Annapolis, MD 21401

Terri Miller
102 Old Solomons Island Road
Suite 202
Annapolis, MD 21401

Bay Area Christian Counseling
102 Old Solomons Island Road
Suite 202
Annapolis, MD 21401

David Kellner
65 Old Solomons Island Rd #104,
Annapolis, MD 21401

Solace Family Counseling LLC
65 Old Solomons Island Rd #104,

Annapolis, MD 21401

Andrea Weiss
3112 Arundel on the Bay Rd,
Annapolis, MD 21403

Connie Coker
3112 Arundel on the Bay Rd,
Annapolis, MD 21403

Craig Langrall
6115 Franklin Gibson Rd.
Tracy's Landing, MD 20779

St. Anne's School of Annapolis Incorporated
3112 Arundel on the Bay Rd,
Annapolis, MD 21403